THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLARENCE GARDNER, Defendant-Appellant.

First District (1st Division)   No. 1—95—1540

Opinion filed June 28, 1996.

Sidney I. Schenkier and Jeff S. Pitzer, both of Jenner & Block, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

In October of 1993, the gangs at Calumet High School in Chicago were the Vice Lords and the Blackstones. Those gangs were "brothers" and got along.

The area of 79th and Carpenter, a few blocks from the high school, was the territory of the Gangster Disciples and the Black Disciples. The two "Disciples" gangs were "folks" and got along with each other.

However, the Vice Lords and the Blackstones hated the Gangster Disciples and the Black Disciples. The area between 79th Street and Calumet High was neutral territory.

Somehow, on October 28, 1993, these gang affiliations and rivalries led to the shooting death of Joseph Waites, Jr. (Waites), the manager of the high school football team who was not a member of any gang. A jury found Clarence Gardner (Gardner) guilty of the first degree murder of Waites. Gardner, who received a sentence of 35 years, raises several issues on appeal. We affirm the conviction, despite our misgivings about the precipitate way the trial court ended the defendant's case.

FACTS

Because the outcome of this case relies heavily on the weight of the evidence, we set out the testimony in some detail.

Waites died from multiple gunshot wounds. Gardner did not shoot Waites. He was tried on a theory of accountability.

The State used Gardner's recorded statement as evidence. In his statement, Gardner said he was a member of the Gangster Disciples. At about 4:55 p.m. on October 28, 1993, Gardner was at 79th and Carpenter in Chicago, Illinois. He saw two other Gangster Disciples, "Tony" and "Meechie," drive up. The car was a "blue 98 four door with five point star rims." The car was Meechie's. Sometimes Meechie kept a gun in the car under the dashboard. Gardner had seen the gun there three or four weeks before the shooting.

Meechie, who was driving, waved Gardner over. Gardner walked up to the car. Meechie and Tony got out.

The three saw members of the Calumet High School football team walking down 80th and Carpenter. The team members turned towards 80th and Morgan. Meechie asked if they were "hooks," meaning were they members of the Blackstone gang. Gardner said nothing. The three ran to the corner of 80th and Carpenter. They were joined by a fourth person, Andre Bridges (Bridges). Bridges was a Black Disciple.

The four then went to 80th and Morgan. Terrence Little, one of the members of the team, walked up to Gardner. About 11 or 12 other members of the team were present. Gardner recognized Joe Waites. Gardner asked Little what was going on. Little said they were having an egg fight. Gardner replied "oh" and walked back

towards 80th and Carpenter. The three other Disciples went with him.

The football team was on the other side of the street. They were walking in the same direction as the Disciples.

When Gardner, Tony, Meechie, and Bridges got back to the corner of 80th and Carpenter, it was crowded. There were about 15 Black Disciples. Meechie and Tony ran back to the car and got in. They drove the car down Carpenter to 80th and Carpenter and parked in the middle of the block. Meechie jumped out. He had his hands in his pockets. He started to walk towards the football team.

Meechie grabbed one of the players, then another one. About six Black Disciples grabbed Waites. They started to punch him. Two of the people punching were Buckeye Lee and Bridges. Some of the players ran.

Gardner joined the others. He punched Waites three times in the chest. Waites fell to the ground. Waites balled up and tried to defend himself, putting his hands around his face. The Disciples beat Waites for about two minutes.

A couple of seconds after the Disciples were done kicking Waites, Tony got out of the car. Tony had a gun, a .25 automatic or a .22. He cocked the gun and told the others to move because he was "fitting to bust him." Gardner understood this to mean that Tony was planning to shoot Waites. Buckeye Lee told Tony to "take care of his business." Gardner said "bust him." By this, he meant "shoot him."

Tony walked up to Waites. Waites was lying on the ground in front of a yard. Tony pointed the gun to Waites' face.

Gardner and Bridges turned around and took about three jogging steps. They heard four gunshots.

Gardner ran to 79th and Racine and went into a house.

This completed Gardner's statement.

Michael Waites (Michael), Waites' brother, testified at trial.

Michael was not a gang member at the time of the incident or the trial. Michael was on the Calumet High School football team. Waites was the team manager.

Michael knew Gardner was in the Gangster Disciples and used the name "Ceno."

Gardner and about 10 to 15 other gang members came up to the team. Gardner asked whether the team "was fitting to jump on some of his folks." Gardner told Michael and Ronel, another football player, to take off their hats. They complied.

A blue Oldsmobile pulled up. The car stopped across the street. Two men got out of the car. When they did, Gardner said "bust them folks."

Gardner asked if the team members were "hooks" or Vice Lords. The team said they were not and showed him their football jerseys. Gardner said "fuck that shit, bust them."

The driver of the car then swung at one of the team members. The driver missed and the other boy swung back. Gardner said "bust them" again. The team started to run. About five seconds later, Michael heard gunshots.

According to Michael, Gardner said "bust at them folks" four times.

Michael told the police Gardner was the one who told the others to shoot. Upon having his memory refreshed, Michael admitted he told the police the person who said "bust at them folks" was a Black Disciple. Michael knew Gardner was a Gangster Disciple. Michael, however, said he later told the police Gardner said "bust at them folks."

The State called Anthony Foster (Foster) to testify.

Foster was not a member of a street gang. He was a member of the football team.

Foster testified that after the conversation where the team members said they were not "hooks," Gardner told the driver of the blue Oldsmobile the team members were "hooks." He said this after the driver and passenger left the car. Gardner then said "bust at their ass." By this, Gardner meant shoot them.

When Foster spoke to the police on November 15, 1993, he told them Gardner was the one who said "bust their ass." Foster did not say that to the police when he was interviewed on the day of the shooting.

Cantrell Davis (Davis) testified for the State.

Davis was on the Calumet High School football team. He was not a gang member.

Davis said once the two people who were in the blue car got out, Gardner told them the football players were "hooks." Gardner said "fuck that folks shoot them, pop at them, bust at them, bust at them."

Davis did not tell the police on October 28 Gardner said "bust at them." He did tell them later. He was unable to talk to the police on October 28 because they would not listen to him.

Gardner presented one witness at trial. The witness was a police officer brought in to impeach earlier testimony. Gardner did not testify.

OPINION

While we find the issues raised by the defendant do not, singly or

collectively, entitle him to a new trial, we believe some of them merit discussion.

### 1. The trial court's refusal to continue the case

Before the jury was selected, the trial court, realizing a Monday holiday was approaching, told prospective jurors it was possible that the trial would run until the following Tuesday. All jurors who claimed outside pressures or time problems were excused by the judge or challenged by one of the parties.

On Friday, at about 3:30 p.m., the defense ran out of witnesses. Gardner's lawyer told the court he had one more witness, Luther Donald, a friend of the victim. Donald had promised to be in court that day, but instead had gone to school. He had been under subpoena for previous trial dates, but not on this day. Defense counsel said he had talked to Donald the night before. Donald said he would come to court, that he understood he was under subpoena. There is no subpoena in the record.

When asked what Donald would testify to, defense counsel said:

> "We expect him to say that he was present with other football players and that he saw this car come up with two people in it. And that he heard the words at that point bust him or shoot him. That it came from one of the people in the car neither of whom were seen. When he first talked to the police he did give them the name Ceno. He did not assign to that person those statements."

("Ceno" was a name used by Gardner.)

The trial judge denied the motion for a continuance to the following Tuesday, saying:

> "Let the record reflect that it is now 3:35. It appears to me on Friday—Monday is a court holiday. Tuesday we are 4 judges short. We have five jury trials, 2 judges to do it, myself and Judge Erickson. *** It seems to me that this witness's testimony is cumulative *** including that somebody in the car said bust him. *** [A]ll the witnesses have said this person got out to the car, said he wanted to bust him or something to that effect. It's already been said. And it's also opinion. ***[I]f it was just one day tomorrow, that wouldn't be so bad. I don't want the jury out on this case for three days and coming in on the 4th especially in view of the Court's schedule and in view of the fact that this is cumulative."

■ Once trial has started, the trial court may grant a reasonably brief continuance in the interest of justice. 725 ILCS 5/114—4(f) (West 1992). Whether to grant a continuance to secure a witness is within the sound discretion of the trial court. *People v. Lewis*, 165 Ill. 2d 305, 327, 651 N.E.2d 72 (1995). When reviewing the denial of a request for a continuance to secure a witness, we consider whether

the witness's testimony was material, whether the testimony might have affected the jury's verdict, and whether the absence of the witness prejudiced the defendant. *People v. Ward*, 154 Ill. 2d 272, 307, 609 N.E.2d 252 (1992). Refusal to grant a continuance may constitute an abuse of discretion when it interferes with the ascertainment of the truth as to whether the person accused is, in fact, guilty of the crime charged. *People v. Ramshaw*, 75 Ill. App. 3d 123, 126, 394 N.E.2d 21 (1979).

The defendant's issue is not clearly drawn by the record. The offer of proof by counsel lacked specificity. Although counsel said he was surprised by Donald's failure to appear, he never at any later stage of the proceedings, including the post-trial motion, attempted to supplement the record with an affidavit from Donald or with Donald's live testimony. It is not clear that defense counsel ever personally interviewed Donald about his proposed testimony. No affidavit so states. In addition, the record contains no subpoena for the missing witness.

However, the trial court did not seem concerned about either the contents of the offer of proof or defense counsel's diligence. The court gave two reasons for denying the continuance: the heavy trial schedule in the criminal courts and the cumulative nature of the proposed testimony.

■ The defendant's right to present witnesses in his own defense is guaranteed by the sixth and fourteenth amendments to the United States Constitution and by article I, section 2, of the Illinois Constitution. " 'Speedy administration of justice is desirable, but the desire for speed must not be allowed to impinge upon the constitutional requirement of a fair opportunity to defend.' " *People v. Lott*, 66 Ill. 2d 290, 297, 363 N.E.2d 312 (1977), quoting *People v. Shrum*, 12 Ill. 2d 261, 265, 146 N.E.2d 12 (1957).

"There is no mechanical test, statutory or other, for determining the point at which the denial of a continuance in order to accelerate the judicial proceedings violates the substantive right of the accused to properly defend." *People v. Lott*, 66 Ill. 2d at 297.

■ Since the trial court was not concerned about defense counsel's diligence or lack of it, the remaining questions we must examine are whether Donald's testimony was material to the case and might have affected its outcome, and whether the defendant's right to a fair trial has been prejudiced. See *People v. Robinson*, 13 Ill. App. 3d 506, 510, 301 N.E.2d 55 (1973). The absence of a witness whose testimony would corroborate only collateral aspects of the defendant's testimony is not sufficient to justify a continuance once the trial has begun. *People v. Timms*, 59 Ill. App. 3d 129, 135, 375 N.E.2d 1321 (1978).

The State's theory at trial was that Gardner was "the one giving the orders, \*\*\* the one that everyone [was] following." Gardner was portrayed as the leader, dictating and directing the course of violence. Donald's proffered testimony, that he heard the words "bust him" or "shoot him" from the car when it drove up, before anyone got out, while Gardner was outside the car, would have addressed the State's theory. For that reason, the testimony, while cumulative to some degree, would have been of use to the defense.

At the same time, we cannot say the proposed testimony was material or that its absence prejudiced the defendant's right to a fair trial. In his confession, Gardner said he saw Tony get out of the car, gun in hand, telling others to move because he was "fitting to bust him." Understanding that Tony was talking about shooting Waites, Gardner admitted then saying "bust him," meaning "shoot him." Tony shot him.

Before that time, according to eyewitnesses, Gardner had ordered Waites' friends to remove their hats, he had told the shooter that Waites and his friends were "hooks," that is, rival gang members, when they were not, and he said "bust them" three or four times. Gardner admitted in his confession to joining six Black Disciples in the beating of Waites. Gardner said he punched Waites three times in the chest before Waites fell to the ground, where he was beaten for about two minutes.

Donald's testimony about hearing "bust him" from someone in the car would not have materially impeached any State witness. The eyewitness testimony and Gardner's own confession place the defendant squarely within a violent enterprise. The applicable principle of law is: " '[W]here two or more persons engage in a common criminal design or agreement, any acts in the furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts.' " *People v. Terry*, 99 Ill. 2d 508, 514, 460 N.E.2d 746 (1984), quoting *People v. Kessler*, 57 Ill. 2d 493, 496-97, 315 N.E.2d 29 (1974).

Under this rule, an accomplice can be held accountable for murder "even without a showing of an intent to kill." *People v. Moreno*, 238 Ill. App. 3d 626, 633, 606 N.E.2d 514 (1992). In *Terry*, the court affirmed the defendants' murder convictions based on a showing that they had conspired with others to commit a battery. In *Moreno*, as here, the defendant participated in a planned gang confrontation. He threw a brick through the window of the car in which the victim was sitting. Affirming the defendant's murder conviction, the court observed that the defendant directed fellow gang members to the

victim, went with them to the victim's car, and made no attempt to withdraw when he learned one of his confederates had a gun. Gardner, in this case, did more to bring about the eventual killing. Whether Gardner said it once or four times, "bust him" is a directive to shoot. We cannot see that Donald's testimony about the initial "bust him" would have made any difference.

We do not want to leave this point without expressing our uneasiness with the trial court's excessive concern about the next week's schedule in the criminal court. It would have been no great inconvenience to the administration of justice to have recessed at 3:35 on a Friday afternoon. We do not diminish the importance of proceeding with dispatch. We simply issue a reminder that the race is not always to the swift, especially where the right to a fair trial is at stake. In this case, however, we find no reversible error.

### 2. The voluntariness of Gardner's confession

■ The defendant contends his confession was involuntary and should not have been admitted. He relies almost entirely on the testimony of his grandmother and legal guardian, Ethel Gardner. She testified she went to the police station at about 12:30 a.m. She said she identified herself to police personnel and asked to see her grandson. After about two hours of waiting and inquiring, she was told by a police officer she could not see her grandson, but that a youth officer was with him, protecting his rights. She went home. The confession admitted in evidence was recorded at about 6:18 a.m., although the police testimony was that Gardner agreed to give a statement some time between 2:30 a.m. and 3 a.m., after orally making incriminating statements two hours earlier.

Police Officer Pienta's testimony differed from Ms. Gardner's. He said she told him to go ahead with the youth officer, that she left without asking to see her grandson.

Gardner was 16 years old at the time of his arrest. A youth officer, charged with protecting the juvenile's rights, was present at all times during questioning. The defendant had been arrested four times before the arrest in this case. The trial court found, and we have no reason to disagree, that Gardner was told his rights several times and voluntarily waived them. There is no evidence he was mistreated.

The trial judge chose to believe the police version of conversations with Ms. Gardner. While we have difficulty believing the juvenile's grandmother would leave the police station without asking to see her grandson, the outcome would not change if we accept Ms. Gardner's testimony as true.

The Juvenile Court Act of 1987 requires that a parent or guardian and a youth officer be notified when a minor is taken into custody. 705 ILCS 405/2—6(a) (West 1992). In this case, Ms. Gardner and a youth officer were notified. While the presence or absence of a parent is a factor to consider when determining the voluntariness of a confession (*In re J.O.*, 231 Ill. App. 3d 853, 855, 596 N.E.2d 1285 (1992)), there is no *per se* rule that the parent or guardian be present. See *People v. Lash*, 252 Ill. App. 3d 239, 246-47, 624 N.E.2d 1129 (1993). Also see *People v. Cooper*, 244 Ill. App. 3d 366, 375, 614 N.E.2d 220 (1993).

Our courts look to the "totality of the circumstances" when determining whether a confession was voluntary, even where a juvenile is involved. *People v. Prude*, 66 Ill. 2d 470, 475, 363 N.E.2d 371 (1977). When that test is satisfied, admissibility of a confession has been upheld where a juvenile's parents were not allowed to see him before the confession was made. *People v. Steptore*, 51 Ill. 2d 208, 214-15, 281 N.E.2d 642 (1972); *People v. Bobe*, 227 Ill. App. 3d 681, 703, 592 N.E.2d 301 (1992).

In this case, a youth officer was present to protect the juvenile's rights, one of the factors distinguishing this case from the extreme circumstances in *People v. Montanez*, 273 Ill. App. 3d 844, 652 N.E.2d 295 (1995). In some cases, the presence of the youth officer would not be enough to demonstrate voluntariness. Here, considering the totality of the circumstances, we cannot say the trial judge's ruling admitting the confession was against the manifest weight of the evidence.

3. Other issues

■ We have reviewed the other issues raised by the defense in this appeal and find them without merit. That is:

(a) The trial judge's questions to the jury concerning direct involvement with a street gang were sufficient to address the possibility of juror bias. See *People v. Dow*, 240 Ill. App. 3d 392, 398-99, 608 N.E.2d 259 (1992).

(b) Evidence of gang membership was admissible, given the circumstances of this case. See *People v. Colon*, 162 Ill. 2d 23, 30, 642 N.E.2d 118 (1994).

(c) The State's comments during final argument ("He may have been 16 years old out there but you have to tell him there's a certain point in your life, that you got to stand up and you got to be a man. *** You are not a man if you stand up and say I am going to shirk my responsibility, it's not my fault") were not direct comments on the defendant's failure to testify. See *People v. Morgan*, 112 Ill. 2d 111, 131, 492 N.E.2d 1303 (1986); *People v. Campbell*, 232 Ill. App. 3d 597, 602, 597 N.E.2d 820 (1992).

(d) The defendant's proposed instruction that being a member of the same gang as the shooter is not enough to make the defendant legally responsible for the shooting was argumentative, incomplete, and unnecessary. The jury was properly instructed.

(e) The trial judge's non-Illinois Pattern Jury Instructions definition of "solicit," given at the jury's request, was accurate (720 ILCS 5/2—20 (West 1992)) and within the trial court's discretion. See *People v. Walker*, 227 Ill. App. 3d 102, 590 N.E.2d 1018 (1992).

(f) The trial judge did not abuse his discretion at sentencing when he considered Gardner's involvement with a street gang "in the commission of the crime."

CONCLUSION

For the reasons stated in this opinion, we affirm the defendant's conviction and sentence.

Affirmed.

BUCKLEY and BRADEN, JJ., concur.