*In re* G.O., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. G.O., Respondent-Appellant).

First District (4th Division)   No. 1—98—0956

Opinion filed March 31, 1999.

Craig O. Donaldson, of Winston & Strawn, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Susan R. Schierl Sullivan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

This case requires us to examine the way juveniles are treated by our judicial system when they are charged with serious offenses. G.O., a 13-year-old, was charged with first degree murder and tried in the juvenile court. The statute under which he was charged (705 ILCS 405/5—33(1.5) (West 1996)) does not provide for a jury trial. G.O., through his lawyer, asked for one anyway. His request was denied. He was found delinquent for first degree murder and committed to the Department of Corrections, Juvenile Division.

We now find the failure to provide G.O. with a jury trial deprived him of equal protection of the law, as guaranteed by the fourteenth amendment of the United States Constitution and article I, section 2, of the Illinois Constitution of 1970. We also find the confession used against him at trial was unlawfully obtained.

FACTS

On October 4, 1997, around 10:15 p.m., G.O., a 13-year-old, was arrested for murder in the shooting death of Rafael Kubera (Kubera).

The prosecution filed a petition for adjudication of wardship, charging G.O. with, *inter alia,* first degree murder. The charge was based on G.O.'s accountability for a shooting by another. On January 6, 1998, G.O.'s attorney filed a formal jury demand and said:

"I do know that jury trials are not allowed mostly in juvenile cases but in two instances they are; that being habitual juvenile offender and violent juvenile offender. And the reason jury trials are allowed is because, of course, those minors are facing determinant sentence.

In the event that [G.O.] is found delinquent, he, too, is serving a determinant sentence. And I would ask therefore that his case be heard before a jury of his peers."

The court denied his motion.

Before trial, G.O. moved to suppress two incriminatory statements. The motion was denied.

At trial, the prosecution called five witnesses: Chicago police officer John Sebeck, eyewitnesses Maggie Borzecka and Juan Gomez, shooting victim Thomas Skutnik, and Chicago police detective Edward Cunningham (Cunningham). The prosecution also offered stipulated testimony from Kubera's mother and medical examiner Dr. James Filkins. G.O. did not call any witnesses and offered testimony by youth officer Alicia Ayala (Ayala) from the suppression hearing as evidence.

The trial court found G.O. delinquent for first degree murder and committed him to the Department of Corrections. This appeal followed.

# DECISION

## 1. Constitutionality of Section 5—33(1.5)

G.O. contends section 5—33(1.5) of the Juvenile Court Act of 1987 (705 ILCS 405/5—33(1.5) (West 1996)) is unconstitutional because it deprives him of his right to a jury trial. He asserts his right to a jury trial is protected by substantive due process, procedural due process, and equal protection of the law.

■ We approach these contentions with the understanding that all statutes are presumed constitutionally valid. *People v. Shephard*, 152 Ill. 2d 489, 499, 605 N.E.2d 518 (1992). The party challenging a statute bears the heavy burden of clearly establishing its constitutional infirmities. *People v. Kimbrough*, 163 Ill. 2d 231, 237, 644 N.E.2d 1137 (1994). Doubts about validity are resolved in favor of the statute. *Shephard*, 152 Ill. 2d at 499.

■ At the same time, it has been more than 30 years since the United States Supreme Court made the sixth amendment right to a jury trial applicable to the states through the fourteenth amendment's due process clause. *Duncan v. Louisiana*, 391 U.S. 145, 20 L. Ed. 2d 491, 88 S. Ct. 1444 (1968). Jury trials, said the Court, are "fundamental to the American scheme of justice." *Duncan*, 391 U.S. at 149, 20 L. Ed. 2d at 496, 88 S. Ct. at 1447.

Before the adjudicatory hearing in this case began, G.O. asked for a jury trial, orally and in the form of a written jury demand. The trial court denied the request, understandably relying on the statute's silence in the matter. No Illinois precedent required a jury trial. The request by G.O.'s counsel was sketchy at best. Still, the issue was raised and is before us without claim of waiver or procedural default. We must decide it.

### a. Due Process

■ G.O.'s due process arguments face an insurmountable obstacle in this intermediate court. The United States Supreme Court has held due process does not assure the right to trial by jury in state juvenile court delinquency proceedings. *McKeiver v. Pennsylvania*, 403 U.S. 528, 29 L. Ed. 2d 647, 91 S. Ct. 1976 (1971). One of the Court's reasons: "If the jury trial were to be injected into the juvenile court system as a matter of right, it would bring with it into that system the traditional delay, the formality, and the clamor of the adversary system and, possibly, the public trial." *McKeiver*, 403 U.S. at 550, 29 L. Ed. 2d at 663, 91 S. Ct. at 1988.

A year earlier, the Illinois Supreme Court found the due process clause of the fourteenth amendment does not require a jury trial in ju-

venile court proceedings. *In re Fucini*, 44 Ill. 2d 305, 255 N.E.2d 380 (1970). The court's decision rested on the belief that applying "the full panoply of adult rights *** to juvenile proceedings would strip those same proceedings of the unique benefits which they were designed to obtain." *Fucini*, 44 Ill. 2d at 309.

Our Illinois Supreme Court has held firmly to the view expressed in *Fucini*. See *People ex rel. Carey v. Chrastka*, 83 Ill. 2d 67, 74, 413 N.E.2d 1269 (1980) (the right to trial by jury is not, as a general proposition, constitutionally required in juvenile proceedings); *In re Beasley*, 66 Ill. 2d 385, 390, 362 N.E.2d 1024 (1977) (respondent in juvenile proceedings is not entitled to admonition of right to jury trial); *People ex rel. Carey v. White*, 65 Ill. 2d 193, 357 N.E.2d 512 (1976) (trial court erred when it found a statutory right to jury trial in delinquency proceedings).

The passage of time has weakened the underpinnings of *McKeiver* and *Fucini*. Today's juvenile justice system is a far cry from the aspirations of Jane Addams. The new Juvenile Justice Reform Provisions of 1998 (Pub. Act 90—590, eff. January 1, 1999 & January 1, 2000 (amending, *inter alia*, Juvenile Court Act of 1987, 705 ILCS 405/1—1 *et seq.* (West 1996))) continues a trend toward criminalizing juvenile court delinquency proceedings. Children charged with serious offenses are treated in a manner that "further underscores the movement away from the rehabilitative ideal to the assumption that age and the potential for rehabilitation do not matter. All that matters is punishment." T. Geraghty, *Centennial of The Juvenile Court: What Would Jane Addams Think?*, Chi. B. Rec. 50, 50-51 (January 1999).

We agree with G.O. that his sentence in this case is punitive and determinate. He was committed to the Department of Corrections, Juvenile Division, until his twenty-first birthday, without possibility of parole or furlough for five years. The statute contains no provision for good-time credit. The judge had no discretion in the matter. It is difficult to find in this sentence the "unique benefits" referred to in *Fucini* (44 Ill. 2d at 309) or the "idealistic prospect of an intimate, informal protective proceeding" described in *McKeiver* (403 U.S. at 545, 29 L. Ed. 2d at 661, 91 S. Ct. at 1986).

A similar kind of sentence for violation of the Habitual Juvenile Offender Act (705 ILCS 405/5—35 (West 1996)) has been described by our supreme court as "determinate confinement, which has as its purpose the protection of society, in addition to the rehabilitation of the individual." *Chrastka*, 83 Ill. 2d at 74.

True, in a separate setting, our supreme court referred to a delinquency proceeding as "protective in nature and the purpose of the [Juvenile Court] Act is to correct and rehabilitate, not to punish." *In*

*re W.C.*, 167 Ill. 2d 307, 320, 657 N.E.2d 908 (1995). But the issue in *W.C.* was whether a written posttrial motion was required to preserve alleged errors in delinquency proceedings. The court held it was not. Here, we address the sentencing required after a finding of delinquency.

The State suggests characterization of section 5—33(1.5) as punitive is inaccurate because the accused juvenile receives the protection of a closed proceeding. Of course, it is the mandatory sentence that is punitive, not the number of people attending the hearing. In addition, the Juvenile Court Act provides for presence of the news media at any hearing. 705 ILCS 405/1—5(6) (West 1996); see *In re J.S.*, 267 Ill. App. 3d 145, 151, 640 N.E.2d 1379 (1994).

We have examined the legislative debates that led to enactment of section 5—33(1.5). The intent was to adopt a punitive approach to a serious societal dilemma: how to deal with violent youthful offenders. See 88th Ill. Gen. Assem., House Proceedings, November 15, 1994, at 24 (statements of Representative Dart); 88th Ill. Gen. Assem., House Proceedings, December 1, 1994, at 80 (statements of Representative Homer); 88th Ill. Gen. Assem., Senate Proceedings, December 1, 1994, at 46 (statements of Senator Dudycz). We make no comment on the rightness or wisdom of the end product. We simply note the General Assembly has succeeded in its purpose.

Whether the fundamental fairness component of the due process clause now requires a reconsideration of the soundness of *McKeiver* and *Fucini* is not a decision for us to make. The great weight of authority compels us to reject G.O.'s due process contentions.

b. Equal Protection

■ Section 5—33(1.5) (now reenacted as 705 ILCS 405/5—750(2) (see Pub. Act 90—590 (eff. January 1, 1999)) does not provide for a jury trial. It does provide:

> "When a minor of the age of at least 13 years is adjudged delinquent for the offense of first degree murder, the court shall declare the minor a ward of the court and order the minor committed to the Department of Corrections, Juvenile Division, until the minor's 21st birthday, without the possibility of parole, furlough, or nonemergency authorized absence for a period of 5 years from the date the minor was committed to the Department of Corrections ***."
> 705 ILCS 405/5—33(1.5) (West 1996).

We are asked to compare section 5—33(1.5) with two other juvenile offenses.

■ A juvenile charged as an habitual juvenile offender is given the right to a jury trial. 705 ILCS 405/5—35(d) (West 1996). If the juvenile

is convicted, the judge is required to commit him to the Department of Corrections, Juvenile Division, until his twenty-first birthday, without the possibility of parole, furlough, or nonemergency authorized absence. 705 ILCS 405/5—35(f) (West 1996). He is, however, entitled to earn "one day of good conduct credit for each day served as reductions against the period of his confinement." 705 ILCS 405/5—35(f) (West 1996).

■ A juvenile charged as a violent juvenile offender is given the right to a jury trial. 705 ILCS 405/5—36(d) (West 1996). The sentence on conviction is the same as that for the habitual juvenile offender. 705 ILCS 405/5—36(f) (West 1996). He, too, can receive day-for-day good-time credit. 705 ILCS 405/5—36(f) (West 1996). Again, the judge has no sentencing discretion.

In 1998, when G.O. was tried, these were the only three offenses where the juvenile court judge had to sentence the respondent to the Department of Corrections, Juvenile Division, until his twenty-first birthday, with no hope of parole or furlough for at least five years.

We consider potential scenarios.

A 13-year-old who had been adjudged delinquent for two separate grand thefts and then was charged with a home burglary in an habitual juvenile offender proceeding could receive a jury trial if he wanted one.

And a 13-year-old who had been adjudged delinquent of a robbery charge and then was charged as a violent juvenile offender because of another robbery charge would be entitled to a jury trial.

But a 13-year-old who never had been arrested before, as is true of the respondent in this case, charged with murder and tried in the juvenile court, could not have a jury trial.[1]

■ Because both parties to this appeal agree no suspect class is implicated here, our standard for judgment "is the relatively relaxed rational basis standard." *People v. P.H.*, 145 Ill. 2d 209, 229, 582 N.E.2d 700 (1991). Strict scrutiny is not required. Under the rational basis standard the classification has to be rationally related to or further a legitimate state interest, and our review is limited and deferential. *People v. R.L.*, 158 Ill. 2d 432, 443, 634 N.E.2d 733 (1994). Courts using rational basis scrutiny will invalidate the classification only "if it is arbitrary or bears no reasonable relationship to the pursuit of a le-

---

[1]The State has moved to strike portions of respondent's brief that refer to G.O.'s lack of prior exposure to the juvenile justice system. The evidence was adduced during the dispositional phase of the proceedings. We cannot believe it came as a surprise to the law enforcement officials who investigated the crime. We deny the motion.

gitimate State goal." *P.H.*, 145 Ill. 2d at 229. If any set of facts conceivably justifies the classification, it passes constitutional muster. *Kimbrough*, 163 Ill. 2d at 238.

Our first task, then, is to determine whether, as G.O. suggests, juveniles charged with murder, charged as a violent juvenile offender, and charged as an habitual juvenile offender are similarly situated. If they are, the "guarantee of equal protection requires that government deal with 'similarly situated' individuals in a similar manner." *Shephard*, 152 Ill. 2d at 499, quoting *People v. Reed*, 148 Ill. 2d 1, 7, 591 N.E.2d 455 (1992). However, equal protection does not preclude treating similarly situated persons differently where the legislature has a rational basis for doing so. *P.H.*, 145 Ill. 2d at 231.

If the three types of juvenile offenders we have described are not similarly situated, our equal protection inquiry is at an end. The answer depends on how we define the class. We believe in 1998 the class consisted of the three kinds of violent offenders who receive punitive, determinate, nondiscretionary sentences of commitment to the age of 21 without hope of parole or furlough for at least five years from the date of commitment.

We do not agree with the State's suggestion that prior adjudications for serious felony offenses somehow separate the habitual juvenile offender and the violent juvenile offender from the juvenile charged with first degree murder. The State's position seems to be that the repeat juvenile offenders are entitled to a jury trial because they, unlike the first degree murder respondent, have previously offended against society. We do not follow the argument. The juvenile found delinquent on a first degree murder charge probably is worse off than the other two offenders, since they receive day-for-day good time credit and he does not. At any rate, we are persuaded the three respondents are similarly situated.

We find support for our conclusion in *Chrastka*, 83 Ill. 2d at 74, where the court defined the habitual juvenile offender proceeding as one that "result[s] in a disposition, determinate confinement, which has as its purpose the protection of society, in addition to the rehabilitation of the individual." That description fits section 5—33(1.5). Treatment upon adjudication is virtually the same.

The question then becomes whether there is some rational basis for granting the right to a jury trial to juveniles charged as violent juvenile offenders and habitual juvenile offenders, but not to a juvenile charged with first degree murder. We can find none. Nor can we find any legitimate legislative goal to be served by granting a jury trial right to two members of the class but denying it to a third.

Each member of the class we have defined is given a nearly identi-

cal sentence because the legislative goal was to punish the offender. Each ends up in the same place for substantially the same time. Our examination of the legislative debates that led to enactment of all these offenses discloses no indication the General Assembly had any different purposes in mind.

For example, see the debate surrounding 88th Illinois General Assembly, Senate Bill 1153, 1994 Session (murder offenders): 88th Illinois General Assembly, House Proceedings, November 15, 1994, at 24 (statements of Representative Dart); 88th Illinois General Assembly House Proceedings, December 1, 1994, at 80 (statements of Representative Homer); and 88th Illinois General Assembly Senate Proceedings, December 1, 1994, at 46 (statements of Senator Dudycz). See also the debate surrounding 81st Illinois General Assembly, Senate Bill 790, 1979 Session (habitual offenders): 81st Illinois General Assembly, Senate Proceedings, May 21, 1979, at 43 (statements of Senator DeAngelis), at 47 (statements of Senator Geo-Karis); 81st Illinois General Assembly, House Proceedings, June 19, 1979, at 100 (statements of Representative Stearney), at 101 (statements of Representative Kosinski), at 101-02 (statements of Representative Ewell), at 103 (statements of Representative Davis); and 81st Illinois General Assembly, House Proceedings, October 31, 1979, at 27 (statements of Representative Johnson), at 29 (statements of Representative Ronan), at 32 (statements of Representative Brummer), at 32-33 (statements of Representative Ewing), at 33 (statements of Representative Borchers).

In fact, the legislature was on notice that it was entering thorny equal protection territory. In 1979, when the habitual juvenile offender statute was enacted, Governor Thompson's amendatory veto message addressed the provision allowing a jury trial:

"A constitutional question exists under the Equal Protection Clause in regard to the statutory provision for a jury trial in habitual offender proceedings. Other juvenile offenders are not afforded this right in adjudicatory hearings. [Citations to *McKeiver* and *Fucini*.] By creating the right to a jury trial in a particular class of juvenile cases, we may risk a judicial decision authorizing juries in all proceedings under the Juvenile Court Act." 1979 J. Ill. Senate 4778-79, Governor James Thompson's Amendatory Veto Message.

The General Assembly ignored the Governor's warning, passing the legislation over his amendatory veto.

■ We conclude the denial of G.O.'s demand for a jury trial deprived him of equal protection of the law. We do not believe it then follows that section 5—33(1.5) is constitutionally offensive. The statute neither grants nor denies a jury trial. We simply hold that a judge's

refusal to grant a jury trial on demand to a juvenile charged under section 5—33(1.5) is a denial of equal protection of the law under the fourteenth amendment of the United States Constitution and article I, section 2, of the Illinois Constitution of 1970, requiring the reversal, in this case, of the trial court's adjudication of delinquency.[2]

2. Voluntariness of G.O.'s Confessions

G.O. was arrested between 10:15 p.m. and 10:45 p.m. on October 4, 1997. He was brought to the police station. At the police station, he was seated at a desk in a small office. Later, he was moved to a larger office area. He was not handcuffed.

G.O. made three statements at the police station on the morning of October 5: the first at about 12:30 a.m., the second at about 3 a.m., and the third at about 3:30 a.m.

The first statement was made to Detective Cunningham and youth officer Ayala. In it, G.O. denied any involvement in Kubera's murder.

The second statement was made to Assistant State's Attorney O'Malley (O'Malley) and Ayala. In this statement, G.O. admitted involvement in Kubera's shooting.

The third statement was made to Cunningham and youth officer Jefferson (Jefferson). In it, he again admitted his involvement in the shooting.

The involvement G.O. admitted to concerned meeting up with Elfego Nunez (Nunez), who told G.O. and three friends he wanted to "get some Popes [rival street gang members] because they had been messing with him a couple days before." The van they were riding in arrived at a nearby park. Nunez obtained a gun from the back of the van. He and G.O. got out of the van. G.O. stopped to urinate while Nunez proceeded toward the park. As G.O. approached the park, he heard someone say, regarding G.O., "Who is the nigger?" G.O. responded by shouting "Maniacs," signifying he was "representing the Maniac Latin Disciples" street gang. The Popes began chasing G.O., who ran toward Nunez. Nunez fired several shots at the Popes. G.O. hollered "Pope killers." They ran back to the van. Later, Nunez

[2]We expect the decision we reach will have limited impact. It applies only to 13- and 14-year-old respondents charged in the juvenile court with first degree murder who ask for a jury trial. Where the juvenile accused of first degree murder is 15 or older, transfer to the adult court is automatic. 705 ILCS 405/5—4(6)(a) (West 1996).

We take judicial notice of Illinois Department of Corrections, 1993-1997 Statistical Summary of the Juvenile Division 14 (1998). According to the summary, 10 juveniles entered the Department of Corrections with first degree murder adjudications in 1997.

placed the handgun in a garbage can and gave the empty shell casings to G.O., who put them in the same garbage can.

G.O. moved to suppress his 3 a.m. and 3:30 a.m. statements. He contended the statements were not voluntary. After a hearing, G.O.'s motion was denied.

■ Generally, a trial court's ruling on a motion to suppress evidence is subject to reversal only if manifestly erroneous. *People v. Dilworth*, 169 Ill. 2d 195, 201, 661 N.E.2d 310 (1996). But *de novo* review is appropriate when neither the facts nor the credibility of the witnesses is questioned. *People v. Williams*, 181 Ill. 2d 297, 309, 692 N.E.2d 1109 (1998); *People v. Harbach*, 298 Ill. App. 3d 111, 117, 698 N.E.2d 281 (1998).

In this case, we accept the trial judge's factual findings. The judge believed the prosecution witnesses, and we do not second-guess that determination. We therefore conduct a *de novo* review of the trial court's denial of the motion to suppress, bearing in mind the State had the burden of establishing the voluntariness of the respondent's confession by a preponderance of the evidence. *People v. Gilliam*, 172 Ill. 2d 484, 501, 670 N.E.2d 606 (1996).

■ The principles of law concerning the voluntariness of a confession are well established. The test is whether an accused's will was overborne at the time he confessed. If so, the confession cannot be deemed the product of a rational intellect and a free will. *People v. Kincaid*, 87 Ill. 2d 107, 117, 429 N.E.2d 508 (1981).

■ We examine the totality of the circumstances to determine whether a statement was made freely, without compulsion or inducement, considering the characteristics of the accused and the details of the interrogation. *People v. Thomas*, 137 Ill. 2d 500, 516, 561 N.E.2d 57 (1990). We are given factors to consider: the defendant's age, education, intelligence, experience, and physical condition; the length and intensity of the interrogation; the existence of any threats, promises, or physical coercion; whether the confession was induced by police deception; and whether the defendant was informed of his constitutional rights. *People v. Martin*, 102 Ill. 2d 412, 427, 466 N.E.2d 228 (1984); *People v. MacFarland*, 228 Ill. App. 3d 107, 117, 592 N.E.2d 471 (1992).

■ While confessions made by juveniles are generally subjected to the same scrutiny as those of adult defendants (*People v. Prude*, 66 Ill. 2d 470, 475-76, 363 N.E.2d 371 (1977)), we recognize:

> "Receiving an incriminating statement from a juvenile is a sensitive concern requiring great care, in the absence of counsel, to assure the juvenile's confession was neither coerced or suggested, nor a product of fright or despair." *In re V.L.T.*, 292 Ill. App. 3d 728, 736, 686 N.E.2d 49 (1997).

Because of that "sensitive concern," additional factors come into play when we consider a juvenile's statement. These include the time of day and the presence of a parent or adult interested in the juvenile's welfare. *In re A.R.*, 295 Ill. App. 3d 527, 533, 693 N.E.2d 869 (1998); *V.L.T.*, 292 Ill. App. 3d at 736. They also include the juvenile's age, education, intelligence, and emotional characteristics, and the juvenile's previous experience with the juvenile court system. *In re J.J.C.*, 294 Ill. App. 3d 227, 238, 689 N.E.2d 1172 (1998).

Section 5—6(2) of the Juvenile Court Act of 1987 (705 ILCS 405/5—6(2) (West 1996)) requires a law enforcement officer who takes a minor into custody to "immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been taken into custody and where the minor is being held." The officer is also required, "without unnecessary delay," to take the minor to the nearest juvenile police officer. 705 ILCS 405/5—6(2) (West 1996).

The purpose of notice is to permit, where possible, a parent to confer with and counsel the juvenile before interrogation and confession. *A.R.*, 295 Ill. App. 3d at 533; *People v. Montanez*, 273 Ill. App. 3d 844, 850, 652 N.E.2d 1271 (1995). When no interested adult is present for the interrogation, the relevant question is whether that absence contributed to the coercive circumstances surrounding the interview, not whether contact with the parent was denied. *A.R.*, 295 Ill. App. 3d at 533; *People v. Knox*, 186 Ill. App. 3d 808, 814, 542 N.E.2d 910 (1989).

A violation of section 5—6(2) does not mandate suppression of the juvenile's confession. *People v. Fuller*, 292 Ill. App. 3d 651, 665, 686 N.E.2d 6 (1997). Nor does the presence of a youth officer make a confession voluntary. *People v. Gardner*, 282 Ill. App. 3d 209, 218, 668 N.E.2d 125 (1996). There is no *per se* right to consult with a parent before or during questioning, but police conduct that frustrates a parent's attempt to confer with a juvenile is a significant factor in determining the voluntariness of a juvenile's confession. *In re Lashun H.*, 284 Ill. App. 3d 545, 552, 672 N.E.2d 331 (1996).

With those principles in mind, we examine the facts of this case. G.O. was 13 years old when he was arrested in the late hours of October 4. This was his first arrest. When questioned at 12:30 a.m. he denied any involvement in the shooting. He was not questioned again until about 3 a.m., by an assistant State's Attorney. That was about 4½ hours after his arrest. There is no evidence that G.O. was physically abused. Nor is there any evidence of threats or promises to obtain his statements. He received *Miranda* warnings each time he was questioned. He was described by his mother as "smart" and "intelligent."

Barbara Perkins (Perkins), G.O.'s mother, arrived at the police station around 3:30 a.m., just after Cunningham obtained an oral statement from G.O. Of critical importance to our analysis is the phone conversation between Cunningham and Perkins. After getting Perkins' phone number from G.O., Cunningham called her:

"A. About 12:15 I called his mom.

Q. Did you reach his mother?

A. Yes, I did.

Q. And you had a conversation with her?

A. Yes, I did.

Q. And what if anything did you tell her?

A. I explained to her her son was in our office in regards to a homicide investigation, that we would like her to come down to the office.

Q. What did she say back to you?

A. She seemed a little reluctant to want to come down. She wasn't sure if she could get transportation, and she made the comment if I came down there, I would probably kill him any way. I wouldn't get the truth out of him.

Q. Did you explain to her that detectives—that either you or other detectives would be speaking with him?

A. Yes. I told her that, and I told her if she didn't come down there would be a youth officer present."

At trial, Cunningham testified Perkins told him "if she was to come, she would have to arrange for public transportation."

After Cunningham got off the phone, he contacted Ayala. Ayala asked Cunningham if he had spoken with G.O.'s parents. Cunningham told Ayala that Perkins "refused" to come to the police station. Then the questioning of G.O. began.

Cunningham's phone conversation with Perkins is notable for what he did not tell her. He did not tell her G.O. was under arrest—for murder or anything else. Nor did he tell her G.O. would be asked to waive his rights. These are factors for us to consider. See *People v. Robinson*, 301 Ill. App. 3d 634, 642, 704 N.E.2d 968 (1998).

Perkins could not make an informed judgment about whether to leave her home after midnight to travel to a distant police station unless she was given some understanding of G.O.'s situation. "Speaking" with the youth is far different from questioning him about a murder for which he has been arrested.

To make matters worse, Cunningham then misrepresented Perkins' response when Ayala asked if G.O.'s parents had been contacted. Cunningham said Perkins "refused" to come to the station. She had not refused. Cunningham testified to her "little reluctance." In fact, she did arrive at about the time Cunningham completed his 3:30 a.m. questioning of G.O.

It is true that youth officers were present when G.O. made his 3 a.m. and 3:30 a.m. statements. But we have examined the record in vain for any indication either youth officer expressed any interest in G.O.'s rights. In fact, we find no indication either youth officer ever said anything to G.O. Their presence was useless. See *J.J.C.*, 294 Ill. App. 3d at 237.

The youth officers simply were more police officers questioning a 13-year-old who never before had been arrested. The statutory purpose behind the requirement that a youth officer be notified was defeated. See *Fuller*, 292 Ill. App. 3d at 667.

■ Our courts repeatedly have held police conduct that frustrates a parent's attempts to confer with his child before or during questioning is significant in determining the voluntariness of a confession. *In re L.L.*, 295 Ill. App. 3d 594, 601, 693 N.E.2d 908 (1998); *J.J.C.*, 294 Ill. App. 3d at 235. We conclude police conduct during the early morning hours of October 5 was designed to frustrate the presence of a parent interested in the juvenile's welfare. See *L.L.*, 295 Ill. App. 3d at 601.

We also take note G.O. never was requested to sign a formal waiver of his rights, his statements never were reduced to writing, and the statements never were given to him to review or sign. (Cunningham did read his account of G.O.'s statement to G.O. and his mother shortly after 3:30 a.m.) See *Lashun H.*, 284 Ill. App. 3d at 552-55.

Without advice and counsel of an adult who cared about him, alone in a large room populated by police officers, experiencing custodial interrogation for the first time in his life, having given an exculpatory statement 2½ hours earlier, 13-year-old G.O. was not a free agent. Whether his mother was on her way to, or whether she was at, the police station is not controlling. What matters is whether, considering the totality of circumstances, G.O.'s will was overcome. We conclude it was. The 3 a.m. and 3:30 a.m. statements should have been suppressed.

### 3. Sufficiency of the Evidence

There was other evidence in the case. Two eyewitnesses, Maggie Borzecka and Juan Gomez, testified to G.O.'s involvement in the shooting by Nunez. There is no double jeopardy problem that would foreclose a retrial.

## CONCLUSION

G.O.'s delinquency adjudication is vacated. The cause is remanded for a new adjudication hearing with directions to suppress G.O.'s

incriminatory statements to law enforcement officials. If G.O. again requests a jury trial the request should be granted by the trial court.

Reversed and remanded.

SOUTH, P.J., and HALL, J., concur.