THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL SAUNDERS, Defendant-Appellant.

First District (1st Division)   No. 1—98—0352

Opinion filed August 23, 1999.

Rita A. Fry, Public Defender, of Chicago (Frederick Weil, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Janet Mahoney, and Eve Reilly, Assistant State's Attorneys, of counsel), for the People.

JUSTICE TULLY delivered the opinion of the court:

Following a bench trial, defendant Michael Saunders was convicted of first degree murder and aggravated criminal sexual assault and sentenced to consecutive prison terms of 34 years and 6 years, respectively. Defendant contends on appeal that collateral estoppel barred the trial court from reconsidering its ruling on defendant's motion to suppress his statement as involuntary and that the court erred in reversing its original finding.

For the reasons that follow, we affirm.

Defendant's convictions arose from a November 6, 1994, incident at 5356 South Bishop in Chicago in which defendant and four codefendants (Jerry Fincher, Vincent Thames, Terrill Swift and Harold Richardson) were indicted because they had sexually assaulted and murdered the victim, Nina Glover. Several months later, Jerry Fincher voluntarily gave the police information regarding the murder, hoping to "get some consideration" for his friend who had been arrested on a drug charge. Eventually, codefendants Fincher, Thames and Swift all gave inculpatory statements that incriminated defendant as well. Defendant was arrested on March 11, 1995, and subsequently gave an inculpatory statement.

Hearings on defendant's motion to suppress his statement were held on September 17 and September 24, 1997. Detective Richard Pal-

adino testified that he was notified at 4 p.m. of defendant's arrest. At 4:30 p.m. Paladino advised defendant of his *Miranda* rights and also told him, as a juvenile, that if he were charged, he would be tried as an adult. Detective Clancey was also present. Defendant stated he understood each of his rights. Paladino told him that everybody involved in the incident was in custody and the police knew what had happened. Paladino said he was not going to question defendant at that time but told him to think about the incident.

At 4:45 p.m., Paladino returned with youth officer Charles Bowen. Paladino again advised defendant as he had done earlier. The youth officer remained for the entire interview.

At 7 p.m., Assistant State's Attorney Valentini questioned defendant after advising him again of his *Miranda* rights and juvenile warnings. Paladino and the youth officer were present. Paladino testified that neither he nor anyone in his presence slapped defendant, pulled on his earring or lied to him about telephoning his mother. Defendant did not ask for either his mother or an attorney and did not invoke his right to remain silent.

On cross-examination, Paladino testified that although he attempted to contact defendant's mother by telephone, he did not note the telephone call in his arrest report. Paladino sent Officers Coughlin and Golden to find defendant's mother at 4:05 p.m. When they were unable to locate her, Paladino contacted the youth officer, who was present during defendant's questioning. The plainclothes youth officer advised defendant of his *Miranda* rights and gave him the juvenile warnings before Paladino questioned him.

Youth Officer Bowen testified that when he first saw defendant at 4:45 p.m., he introduced himself as a youth officer and told defendant he was there to protect defendant's rights as a juvenile. Bowen advised defendant of his rights and told him that he would be tried as an adult if the charges were approved. Defendant stated that he understood. Bowen corroborated that Paladino also advised defendant similarly and that defendant again indicated his understanding.

At 7 p.m., Bowen reintroduced himself and again advised defendant of all his rights. The assistant State's Attorney then advised defendant regarding his *Miranda* rights and juvenile warnings. Defendant stated that he understood. The interview lasted 45 minutes. At that time, the assistant State's Attorney explained the nature of both a court-reported and handwritten statement to defendant. Defendant chose to give a handwritten statement. Bowen testified that neither he nor anyone in his presence slapped defendant or pulled his earring. Defendant did not ask for his mother or an attorney and did not ever say he did not understand anything.

Defendant's mother, Emma Saunders, testified that the last time she saw defendant before his arrest was about 5 p.m. the previous day. When he was not home the following morning, she began telephoning hospitals and police stations. She first telephoned the police station at 51st and Wentworth at 11 a.m. on March 11, 1995, and was told defendant was not there. When she telephoned again 15 minutes later, an officer told her that defendant was there. She arrived at the police station about 1 p.m. but was told she could not see defendant. An officer told her that defendant was at the juvenile facility at 11th Street and Hamilton. When she arrived at the juvenile facility, she was told defendant was not there, but she remained until late in the afternoon. She learned that defendant was at the juvenile facility the following day. She initially testified that she lived at 6707 South Aberdeen and subsequently that she lived at 6737 South Aberdeen. She stated she had no telephone but could be contacted at her mother-in-law's telephone number, which she specified.

Defendant testified that he was 15 years old at the time of his arrest. Although he was registered at a high school, the last time he had regularly attended school was in eighth grade. After he was arrested, three police officers came into the room and slapped him on the neck. One officer snatched the earring out of his ear and threw it on the ground. Defendant denied that he was arrested at 4 p.m.; he claimed he was arrested at 10 a.m. He testified that no one advised him of his rights or told him he could be tried as an adult. Defendant said he asked the officers to telephone his mother and gave them his grandmother's telephone number, but the officers did not say they would try to locate his mother. Defendant testified that he asked to have an attorney present during his questioning, but the officers told him to "shut up." He was not taken before a judge for a hearing, and he remained in the police station until 10 a.m. the next day. He claimed that the youth officer did not speak to him at all while he was in custody. He told his mother the following day about the earring being pulled from his ear and also told a man who worked in the lockup about the incident, but the man told him he could not do anything about it. Defendant denied making the telephone call noted on the arrest report to his grandmother's number at 10:30 p.m. while he was in the lockup. The number on the arrest report was the one given by defendant's mother as that of her mother-in-law. Defense counsel objected to the State's reference to an arrest report with writing on it. Defense counsel had two arrest reports, one of which had no writing on it. A discussion was held off the record.

Defendant admitted on cross-examination that the signature on each page of his eight-page handwritten statement was his. He also

testified that in March 1995 he understood each of the *Miranda* warnings and had heard those warnings many times. But he denied that he gave the statement to an assistant State's Attorney. He stated that he spoke only to three officers, none of whom was a youth officer. Defendant testified that he confessed because the officers threatened him and woke him about 3 a.m., telling him to sign his name to the statement.

In rebuttal, the parties stipulated that Detective William Foley would testify that he did not slap defendant or pull his earring.

Assistant State's Attorney Fabio Valentini testified that at 7 p.m. on March 11, 1995, he advised defendant of his *Miranda* rights, and defendant stated he understood each of them. Valentini also explained that even though defendant was a juvenile, because of the charges, he would be tried and sentenced as if he were an adult. Defendant stated that he understood and agreed to answer questions. After a 30-minute conversation, Valentini explained the ways in which defendant's statement could be memorialized. Defendant said he wanted a handwritten statement. Before writing the statement, Valentini and the youth officer were alone with defendant, and Valentini asked him how he had been treated by the police. Defendant responded, "very good." Defendant did not state that the police slapped him or pulled his earring, and Valentini did not notice any injuries. Valentini began writing defendant's statement at 8:20 p.m. After he completed defendant's statement, he asked defendant to read aloud the preprinted portion regarding his rights and the additional juvenile warnings that Valentini had written out. Defendant read and stated he understood his rights and then signed immediately below. With defendant sitting beside him, Valentini read the remaining statement aloud. Defendant made several corrections, initialed them, and signed each page after verifying its correctness.

Valentini testified on cross-examination that he did not try to contact defendant's mother or ask if defendant wanted to have her present. Valentini did not ask defendant to repeat his rights in his own words because defendant spoke intelligently and seemed to understand what Valentini said.

Following argument, the trial court sustained defendant's motion to suppress the statement. The court criticized the youth officer for failure to go out and look for defendant's mother and found that a question existed about what the police officers did or did not do to contact her. The court acknowledged, however, that there was a possible discrepancy with the telephone number and address.

The court stated:

"[It is] abhorrent [that] the police simply look at a defendant as a

defendant, period. And they ignore the fact that—because the law doesn't say you have to do this, then they ignore it. Or they give it short shrift. Well, that might work out in the district, but it's not working here."

The State asked the court for the basis of its ruling, stating that the law did not impose a duty upon youth officers to do what the court stated it believed they should do.

The court specifically found it did not believe defendant was slapped, but it stated it had not been "convinced" a telephone call had been made or that the police had made a good-faith effort to contact defendant's mother. The court also expressed concern over the discrepancy between the differing copies of the arrest report, one of which noted that defendant was allowed a telephone call. The court asked, "did he get a phone call, and he's lying, or did somebody just write this stuff in here?"

The State asked if that information would make a difference in the court's ruling. The court answered, "I don't know." The court granted the State's request for "leave to reopen" its rebuttal.

At a hearing one week later, which the court stated was a "continuation" of the motion, Officer Richard Coughlin testified that he arrested defendant at 4 p.m. Defendant told Coughlin his telephone number was 651-6292. Detective Paladino called that number, but no one answered. Then, Coughlin went to the address provided by defendant, 6707 South Aberdeen, to find defendant's mother. He found a house and several vacant lots. When no one answered his knock, he returned to the police station and asked defendant his address again. Defendant repeated that it was 6707 South Aberdeen. Coughlin verified with defendant that the address was "the first house."

Coughlin also testified that one copy of the arrest report was the original. The other was a photocopy of the original that is taken into the lockup for the watch commander to sign. Then, the remaining boxes on the form are filled out there. Copies are generally made before the entire form is completed. The youth officer adds details to his copy.

Lloyd Huddleston testified that he was a civilian employee in the lockup. He screened prisoners and arranged for prisoner telephone calls. He also completed a screening record on the back of the arrest report. When Huddleston interviewed defendant at 11:58 p.m. on March 11, defendant answered that he had no pain or injury and Huddleston noticed no injury. Defendant did not state that he had been slapped or that his earring had been pulled from his ear. Defendant refused to give Huddleston the name of a person to notify in case of emergency. Defendant made a telephone call to 651-6292, and Huddleston noted the telephone number on the arrest report.

Officer Francis Zoller testified that he searched defendant at 10:30 p.m. on March 11 in the lockup. Defendant did not complain that he had been slapped or that his earring had been pulled.

The trial court found that the State had presented convincing evidence regarding issues about which the court had previously had "serious question." The court stated it now believed that the police went out and tried to locate defendant's mother but were unable to do so. The court commented that "[e]ven she was hesitant about the address" when she testified. Stating that it was convinced that defendant was afforded the requisite statutory juvenile rights, the court denied defendant's motion to suppress.

■ Defendant contends that collateral estoppel barred the trial court from reconsidering its ruling. A ruling on a motion to suppress "may be changed or reversed at any time before final judgment." *People v. Zinnamon*, 266 Ill. App. 3d 671, 675, 639 N.E.2d 1296 (1993). Thus, we find no merit to defendant's contention that collateral estoppel barred the trial court from doing so.

Defendant also contends that the additional evidence presented did not refute the basis of the court's original ruling that the State had not proved defendant's statement was voluntarily given.

■ ■ On review of a trial court's voluntariness determination that involved resolving questions of credibility, we will not disturb the decision unless it was against the manifest weight of the evidence. *People v. Oaks*, 169 Ill. 2d 409, 447, 662 N.E.2d 1328 (1996). The State must establish that a defendant's confession was voluntary by a preponderance of the evidence. *People v. Bounds*, 171 Ill. 2d 1, 32, 662 N.E.2d 1168 (1995); *In re J.E.*, 285 Ill. App. 3d 965, 974, 675 N.E.2d 156 (1996). Among the factors a court should consider are the age, education and intelligence of the accused, the duration of his detention and questioning, whether he was advised of his constitutional rights and whether he was subjected to any physical coercion, threats or promises. *People v. Brown*, 169 Ill. 2d 132, 144, 661 N.E.2d 287 (1996); *In re D.C.*, 244 Ill. App. 3d 55, 61, 613 N.E.2d 1139 (1992). Regarding a juvenile's statement, a court considers additional factors, including the time of day, the presence of a parent or adult interested in the juvenile's welfare, and the juvenile's previous experience with the court system. *In re G.O.*, 304 Ill. App. 3d 719, 731, 710 N.E.2d 140 (1999). The overall consideration in determining voluntariness is whether the accused's statement was made freely and without compulsion or inducement or whether his will was overborne at the time of his confession. *Brown*, 169 Ill. 2d at 144; *People v. Patterson*, 154 Ill. 2d 414, 445, 610 N.E.2d 16 (1992).

■ Defendant argues that the court changed its ruling based on

tenuous and faulty reasoning and that defendant's mother presented uncontradicted testimony that her request to see defendant at the police station was denied. However, whether a juvenile's parent was allowed to see him before he confessed is but one factor in the "totality of the circumstances" test that a court employs to determine if the confession was voluntary. *People v. Gardner*, 282 Ill. App. 3d 209, 218, 668 N.E.2d 125 (1996); see also *In re J.E.*, 285 Ill. App. 3d at 976. In this case, Emma Saunders testified that a police officer told her shortly after 11 a.m. on March 11 that defendant was at the police station. However, the State's witnesses testified that defendant was arrested at 4 p.m. that day, which is also the time of arrest noted on the arrest report. The trial court properly determined the issue of credibility on the issue in favor of the State. The record supports the court's factual determination that the officers attempted to contact defendant's mother both by telephone and in person but were unable to do so. In addition, there was a youth officer present when defendant was questioned. See *Gardner*, 282 Ill. App. 3d at 217; *People v. Anderson*, 276 Ill. App. 3d 1, 7, 657 N.E.2d 57 (1995). The youth officer told defendant he was a youth officer who was there to protect defendant's rights. He also advised defendant of his rights and gave him the additional juvenile warnings. Defendant was arrested at 4 p.m. and, before being questioned, was advised of his rights several times by police officers and the assistant State's Attorney. He gave his statement at 8:20 p.m., stating that he had been treated very well by the officers. The record also establishes that this was not defendant's first encounter with the judicial system; he had been found delinquent on three prior occasions. Thus, this case is significantly distinguishable from the facts presented in *In re G.O.* In that case, there was no evidence the youth officer ever said anything to the 13-year-old defendant, the police conduct was "designed to frustrate the presence of a parent," the defendant's statements were never reduced to writing and he was never asked to sign a waiver of his rights, and he had never before been arrested. *In re G.O.*, 304 Ill. App. 3d at 733 (holding that the juvenile's statements should have been suppressed). Here, after the additional witnesses for the State testified, the court was convinced that defendant's rights had been protected and the police had acted appropriately. The trial court was not required to make its decision on the evidence presented at the reopened hearing alone. Rather, it could reconsider its initial ruling in light of all of the evidence. Considering the totality of the circumstances, the trial court's decision that defendant's statement was voluntarily made after being properly advised of his rights was not against the manifest weight of the evidence. See *In re J.E.*, 285 Ill. App. 3d at 976-78; *Gardner*, 282

414

Ill. App. 3d at 218. The cases upon which defendant relies are factually distinguishable.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

O'BRIEN, P.J., and O'MARA FROSSARD, J., concur.