# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Mitchell*, 2012 IL App (1st) 100907

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEITH MITCHELL, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-10-0907 |
| Filed | May 16, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court affirmed in part and reversed in part the dismissal of defendant's successive postconviction petition filed following his convictions for murder and aggravated battery, in that the dismissal of his claims that there was new evidence of his innocence and that favorable evidence was withheld by the State was upheld, but the dismissal of the petition was reversed on the grounds that there was new evidence concerning the State's use of perjured testimony at the hearing on the motion to suppress statements made to the police and at trial and that defendant received ineffective assistance from both trial and appellate counsel. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 92-CR-19459; the Hon. Thomas J. Hennelly, Judge, presiding. |
| Judgment | Affirmed in part and reversed and remanded in part. |

Counsel on
Appeal

Exoneration Project, of Chicago (Jon Loevy, Russell Ainsworth, Gayle
Horn, Tara Thompson, and Elizabeth Wang, of counsel), for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Marie
Q. Czech, and Joan F. Frazier, Assistant State's Attorneys, of counsel),
for the People.

Panel

JUSTICE NEVILLE delivered the judgment of the court, with opinion.
Justice Murphy specially concurred, with opinion.
Justice Salone specially concurred, with opinion.

## OPINION

¶ 1     A jury found the defendant, Keith Mitchell, guilty of murder and aggravated battery, and
this court affirmed the convictions. *People v. Mitchell*, No. 1-95-3766 (July 13, 1998)
(unpublished order under Supreme Court Rule 23). The trial court summarily dismissed
Keith's first postconviction petition in 1999. The appeal presently before this court involves
a successive postconviction petition Keith filed in 2002. In that petition, after amendment,
Keith claimed (1) that new evidence established that he did not commit the crime; (2) that
new evidence showed he suffered ineffective assistance of trial and appellate counsel; (3)
that new evidence established that the trial court should have suppressed testimony
concerning statements he made to the police; (4) that new evidence established that the State
used perjured testimony to obtain the conviction; and (5) that the State withheld evidence
favorable to the defense. The trial court dismissed the petition without holding an evidentiary
hearing.

¶ 2     We affirm the trial court's dismissal of Keith's claims that new evidence shows he did
not commit the crime and that the State withheld evidence favorable to the defense. We
reverse the dismissal of the petition insofar as Keith presented new evidence that crucial
testimony, which led the court to admit into evidence testimony that Keith confessed to the
crime, came from a police officer who committed perjury in similar cases to persuade courts
to admit into evidence coerced statements. Finally, we direct the trial court on remand to hear
evidence concerning Keith's claims (1) that the State used other perjured testimony at trial
to obtain the conviction, and (2) that his trial and appellate counsel provided ineffective
assistance when they failed to investigate adequately the available evidence that Keith did
not commit the crime.

¶ 3                                    BACKGROUND

¶ 4     On July 21, 1992, Howard Shell and another man robbed Debra Bates at gunpoint in her

-2-

home. Debra's son, Jermaine Bates, was a member of the Vice Lords. Around 12:45 p.m. on July 22, 1992, two young black men shot Shell and several other persons near a street corner on the south side of Chicago. Shell died from multiple gunshot wounds. Police who responded to the report of the shooting spoke with the surviving victims of the shooting and several other witnesses in the area, including Joseph Tribett. Police questioned Jermaine about a week later. After the interrogation of Jermaine, police began looking for Tyce Dove, Lanell Townsend, and Keith Mitchell. Keith was 15 years old and had no prior arrests.

¶ 5        On August 1, 1992, police asked Keith's mother, Audrey Mitchell, to bring Keith to Area 2 police headquarters. Audrey drove Keith to the station and sat with him while police questioned him about the murder. Initially, Keith told police he knew nothing about the matter. Audrey contacted an attorney, but she had to leave the interrogation room to answer a page. After Audrey left the interrogation room, police obtained another statement from Keith. Keith then spoke briefly with an assistant State's Attorney. Keith did not sign a written statement. Police arrested Keith on charges that he murdered Shell and committed aggravated battery against two of the other victims of the shooting. Police maintained that Keith confessed to the crimes during the interrogation. Keith swore that he never said he had any involvement in the shootings.

¶ 6        Prosecutors informed defense counsel that they intended to introduce testimony from police officers and an assistant State's Attorney that Keith confessed to the crimes. Defense counsel moved to suppress the testimony.

¶ 7                               Suppression Hearing

¶ 8        At the hearing on the motion to suppress, Audrey testified that she told police she had contacted an attorney to represent Keith. When she left the interrogation room to respond to the page, police stopped questioning Keith and assured her they would not resume questioning in her absence. But when she returned, a police officer told her he would arrest her if she tried to enter the interrogation room. Later police told her Keith had confessed to the murder.

¶ 9        Keith testified that police began the questioning without informing him of his rights. They resumed questioning once his mother left the room. They cracked their knuckles and made other gestures he found threatening. Keith never agreed to talk to police in his mother's absence. However, he answered some of their persistent questions. Police then told him to repeat his answers to the assistant State's Attorney. The assistant State's Attorney then read Keith his rights, and Keith told her what he said to police. He told the assistant State's Attorney he would not sign any statement.

¶ 10       Detective Michael McDermott testified that when Keith arrived at the station, McDermott read him his rights and questioned him in Audrey's presence. Audrey did not say anything about getting Keith an attorney. When Audrey left the room, McDermott stopped the questioning. According to McDermott, Keith initiated further conversation by saying he would tell police what really happened, but he did not want to say anything with his mother in the room. No other witness corroborated this crucial part of McDermott's testimony. McDermott alone claimed that Keith restarted the questioning on his own after the officers

-3-

stopped all questioning when Audrey left the room.

¶ 11    McDermott further testified that he reminded Keith of his rights and then brought in first a youth officer from Area 2, and then an assistant State's Attorney to hear the confession. The youth officer and the assistant State's Attorney both testified that Keith said he wanted to make his statement without his mother in the room.

¶ 12    The trial court found McDermott and other witnesses for the prosecution more credible than Keith and Audrey, so the court denied the motion to suppress the evidence.

¶ 13                                First Trial

¶ 14    Before trial, prosecutors gave defense counsel a list of witnesses. The State's list of witnesses included Tribett, but neither party called him as a witness.

¶ 15    An officer who went to the scene of the shooting testified that he interviewed the shooting victims other than Shell. The victims described the shooters as young black men, 18 to 24 years of age. All the victims admitted that they did not see the shooters well and they would not be able to identify the shooters. Two of the shooting victims also testified, describing the scene of the shooting. Neither identified Keith as one of the shooters. No physical evidence connected Keith to the crime scene. The prosecution relied on the testimony of two police officers and the assistant State's Attorney about what Keith said to police after Audrey left the interrogation room.

¶ 16    McDermott repeated his testimony from the motion to suppress, adding that Keith said he belonged to the Vice Lords. The youth officer testified that Keith said he and other Vice Lords met on July 22, 1992, in the morning, to discuss how to respond to the robbery of Debra Bates. They decided to shoot Shell where they knew he would be around noon. According to the youth officer, Keith said he and Dove got guns while Townsend agreed to wait nearby so he could help dispose of the guns. After the shooting, Keith left his gun at the home of another Vice Lord. The youth officer admitted that he made no written report of the confession. The arrest report also had no mention of any confession from Keith. The assistant State's Attorney corroborated the youth officer's testimony about Keith's confession. She made no notes of her conversation with Keith.

¶ 17    Audrey testified that in her presence in the interrogation room, Keith never said anything about Vice Lords. He only told police he knew nothing about the shooting. She told police she had contacted an attorney to represent Keith, and police agreed not to speak to Keith before his attorney arrived.

¶ 18    Keith testified that he has never belonged to the Vice Lords, and he never said to police or the assistant State's Attorney that he belonged to the Vice Lords. He did not tell police he shot at anyone or that he had anything to do with the murder. He never agreed to talk to police in his mother's absence. Police questioned him threateningly once his mother left the room. He told the officers that he heard shots on July 22, 1992, from a distance, but he did not know who did the shooting.

¶ 19    In rebuttal, the State presented the testimony of Detective Jack Wilkins, another Area 2 officer, who swore that Keith said he belonged to the Vice Lords. Wilkins corroborated the

accounts the youth officer and the assistant State's Attorney gave concerning Keith's statements.

¶ 20    The jury failed to reach a verdict. The court declared a mistrial and scheduled a new trial.

¶ 21                                Second Trial

¶ 22    The State retried Keith in a double jury trial along with codefendant Dove. At the second trial, the State presented essentially the same evidence it presented at the first trial against Keith, and Keith presented the same defense evidence.

¶ 23    In rebuttal, however, the State found a new witness. Gene Keller testified that he belonged to the Vice Lords, and he saw the Vice Lords initiate Keith into the gang early in 1992. On July 22, 1992, Keller saw Townsend driving near the scene of the shooting, and he saw Dove run up to Townsend's car and put something in Townsend's lap.

¶ 24    The new jury found the evidence sufficient to convict Keith of murder and two counts of aggravated battery. The trial court sentenced Keith to 30 years' imprisonment for murder and to two terms of 15 years each for aggravated battery, with all sentences to run concurrently.

¶ 25                          Posttrial Proceedings

¶ 26    An attorney different from trial counsel helped Keith with posttrial proceedings. On the direct appeal, posttrial counsel argued that trial counsel provided ineffective assistance when he failed to call Keith's attorney as a witness at the hearing on the motion to suppress. This court affirmed the conviction. *People v. Mitchell*, No. 1-95-3766 (July 13, 1998) (unpublished order under Supreme Court Rule 23).

¶ 27                        Postconviction Petitions

¶ 28    Keith filed a postconviction petition, and the trial court summarily dismissed the petition in 1999. Keith filed a successive postconviction petition in 2002. After an attorney helped him amend the petition, the petition raised essentially five separate arguments for a new trial: (1) new evidence proved Keith did not commit the murder; (2) new evidence showed that his trial and appellate counsel provided ineffective assistance; (3) new evidence showed police coerced any statements he made at Area 2; (4) new evidence showed prosecutors used perjured testimony to obtain the convictions; and (5) the prosecution withheld evidence favorable to the defense.

¶ 29    Keith supported the postconviction petition with numerous exhibits. Joseph Tribett signed an affidavit in which he swore that he witnessed the murder, and he got a good look at the shooters. He said in the affidavit that he told a police officer at the scene that he could remember the faces and positively identify the shooters. He remained available for years at the address he gave police. Neither police nor any attorneys ever contacted him to ask him about what he saw. Tribett knew Keith from the neighborhood in 1992. Keith was smaller and had a lighter complexion than both of the shooters. Tribett swore Keith did not shoot Shell or the other shooting victims on July 22, 1992.

¶ 30    Keith submitted his own affidavit in which he swore he did not see the police reports until 2001. Before that he did not know Tribett had any information about the shooting.

¶ 31    Jermaine Bates signed an affidavit in which he swore that police questioned him at Area 2 about the murder. McDermott hit Jermaine hard and threatened to charge him with murder. Jermaine made up a story naming Keith and Dove as the shooters, and he signed a statement recounting his fabrication. Jermaine, who admitted that he had belonged to the Vice Lords, knew that Keith never joined the Vice Lords. Jermaine did not believe that Keith had anything to do with the shootings.

¶ 32    Keller signed an affidavit in which he admitted that he belonged to the Vice Lords, and he knew Keith never joined the gang. Police at Area 2 questioned Keller and threatened to charge him with the murder if he did not give a statement. Police told him they would not charge him if he testified that Keith belonged to the Vice Lords. He perjured himself, as police demanded, because he feared for himself and he needed to return home to look after his two new babies.

¶ 33    Most of the other documents supporting the petition relate to the pattern of extensive criminal conduct committed by police at Area 2. The crimes included (1) the torture of suspects and (2) perjury by police officers concerning confessions purportedly obtained from those suspects. A report of special prosecutors concerning an investigation into the crimes police committed at Area 2 specifically found sufficient evidence to prove beyond a reasonable doubt that McDermott, amongst others, participated in aggravated battery of suspects and perjured himself about alleged confessions.

¶ 34    The trial court dismissed Keith's successive postconviction petition without holding an evidentiary hearing. Keith now appeals.

¶ 35                                    ANALYSIS

¶ 36                             Supreme Court Rule 342

¶ 37    Defense counsel failed to provide a complete table of contents with page references of the record on appeal. Supreme Court Rule 342 requires the appellant to file an appendix containing a copy of the judgment appealed from and a complete table of contents for the record on appeal. Ill. S. Ct. R. 342(a) (eff. Jan. 1, 2005). We have decided to address the issues on the merits despite the violation of the rules. See *People v. Kraft*, 277 Ill. App. 3d 221, 224 (1995).

¶ 38                             Standard of Review

¶ 39    We apply familiar standards to review the trial court's judgment. Because the court dismissed the petition without an evidentiary hearing, we review its decision *de novo*. *People v. Coleman*, 183 Ill. 2d 366, 380-89 (1998). We must not resolve any contested factual issues at this stage of proceedings. *Coleman*, 183 Ill. 2d at 381.

¶ 40    The Post-Conviction Hearing Act restricts the use of successive postconviction petitions. 725 ILCS 5/122-1(f) (West 2006). For the court to order an evidentiary hearing on a successive postconviction petition, the petitioner must either meet the cause-and-prejudice

test (725 ILCS 5/122-1(f) (West 2006)), or he must present new evidence of actual innocence (*People v. Ortiz*, 235 Ill. 2d 319, 330 (2009)).

¶ 41    For the cause-and-prejudice test, the petitioner must show that an objective impediment precluded him from raising the issue in an earlier proceeding and that he suffered a violation of his right to due process. *People v. Pitsonbarger*, 205 Ill. 2d 444, 460-64 (2002).

¶ 42    To show actual innocence, the petitioner must present newly discovered evidence that differs sufficiently from the evidence at trial and that would probably change the result on retrial. *Ortiz*, 235 Ill. 2d at 333.

¶ 43                                          Actual Innocence

¶ 44    A conviction of a defendant who can show actual innocence of the crime charged violates the defendant's right to due process under the Illinois Constitution. *Ortiz*, 235 Ill. 2d at 331-32. Keith claims that four pieces of newly discovered evidence show that he did not commit the shootings here: (1) Tribett's affidavit, in which he swore that he saw the shootings and that Keith did not shoot the victims; (2) Jermaine Bates's affidavit, which explains that Jermaine fabricated the story that led police to question and arrest Keith; (3) Keller's affidavit, in which he admitted that he lied at Keith's trial and swore that Keith never became a member of the Vice Lords; and (4) the special prosecutor's report, which detailed evidence of extensive criminal conduct by police officers at Area 2 and which specifically found evidence sufficient to prove beyond a reasonable doubt that McDermott committed perjury in other trials.

¶ 45    The special prosecutor's report does not prove actual innocence. Instead, it shows the weakness of the prosecution's case. See *People v. Gonzalez*, 407 Ill. App. 3d 1026, 1037 (2011).

¶ 46    In their affidavits, both Jermaine and Keller swore that Keith never joined the Vice Lords. In view of the State's evidence that members of the Vice Lords committed the crimes, the affidavits constitute evidence that Keith did not participate in the shootings. But Keith testified at trial that he did not belong to the Vice Lords. Thus, that part of the new evidence is merely cumulative of Keith's testimony. See *Ortiz*, 235 Ill. 2d at 333.

¶ 47    Jermaine's affidavit adds evidence that police started searching for Keith based on a story Jermaine concocted in response to beatings and threats. The evidence would support a finding of police misconduct, but it does not prove that Keith did not commit the crimes.

¶ 48    Similarly, Keller's affidavit includes evidence that police used threats and intimidation to coerce Keller into committing perjury. That evidence shows police misconduct, but not actual innocence. Insofar as the affidavits go beyond evidence cumulative to Keith's testimony that he never joined the Vice Lords, the affidavits show the weakness of the prosecution's case, but they do not show actual innocence.

¶ 49    Tribett's affidavit constitutes noncumulative evidence of actual innocence. See *People v. Munoz*, 406 Ill. App. 3d 844, 855 (2010). We will consider evidence newly discovered after the trial if the defendant and his attorney could not have found the evidence earlier by the use of due diligence. *People v. Hallom*, 265 Ill. App. 3d 896, 906 (1994). Thus, the

appellate court held, in *People v. Martin*, 112 Ill. App. 3d 486, 501 (1983), that when a defendant's attorney has failed to look for a witness the State listed in its answer to discovery, the witness's testimony does not count as newly discovered after the trial. Because the State listed Tribett during discovery on its witness list, his affidavit about what he saw does not qualify as newly discovered evidence. Accordingly, we find that the trial court correctly held that Keith's successive postconviction petition did not require an evidentiary hearing on his claim that he could show actual innocence.

¶ 50    We find that under these circumstances, where Keith's trial and posttrial counsel failed to interview an exculpatory witness, we should address the claim as grounds for arguing that Keith's attorneys provided ineffective assistance of counsel. See *Baumann v. United States*, 692 F.2d 565, 580-81 (9th Cir. 1982) (claim of newly discovered evidence treated as a claim for ineffective assistance of counsel where the defendant's attorney failed to interview known witnesses).

¶ 51                              Ineffective Assistance of Counsel

¶ 52    Keith claimed in his successive postconviction petition that his trial and posttrial counsel provided ineffective assistance. The attorneys who represent Keith in this appeal argue that Keith has presented sufficient evidence to require an evidentiary hearing on his claim that his trial counsel provided ineffective assistance. Although appellate counsel does not also raise the issue of ineffective assistance of posttrial counsel, we note that the trial court should not have dismissed the postconviction petition if Keith presented sufficient evidence to require an evidentiary hearing on the claim in his successive postconviction petition that his posttrial counsel provided ineffective assistance. In that petition, Keith claimed that posttrial counsel provided ineffective assistance because posttrial counsel failed to raise the strongest argument to show that trial counsel provided ineffective assistance. Keith in his own affidavit swore he did not know that Tribett witnessed the shooting until 2001, when he finally saw the police reports the prosecution showed his attorney. Because a reasonably diligent defendant may rely on his attorney to conduct his defense, ineffective assistance of counsel constitutes cause for a defendant's failure to raise an issue at a stage of proceedings for which he has relied on his counsel. See *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). An attorney provides ineffective assistance when he fails to conduct an adequate investigation into the evidence concerning the charges against his client. *People v. Makiel*, 358 Ill. App. 3d 102, 107 (2005).

¶ 53    To show that posttrial counsel provided ineffective assistance, a defendant must show that counsel committed objectively unreasonable errors, and if counsel had not erred, the appellate court would have, with reasonable probability, reversed the conviction. *People v. Mitchell*, 189 Ill. 2d 312, 332 (2000). Posttrial counsel has a duty to investigate the case and support the defendant's claims with adequate documentation. See *McCrimmon v. United States*, 853 A.2d 154, 160 n.12 (D.C. 1992).

¶ 54    Here, posttrial counsel argued on the direct appeal that trial counsel provided ineffective assistance when he failed to present an attorney as a witness at the suppression hearing. Posttrial counsel apparently did not investigate the case thoroughly enough to discover that

trial counsel failed to try to contact the listed witnesses, including the only witness who said he saw the shooters well and who would swear that Keith did not shoot the victims. We find support in the record for Keith's claim in his postconviction petition that posttrial counsel provided objectively unreasonable assistance when posttrial counsel failed to discover that trial counsel conducted an insufficient investigation and when posttrial counsel failed to argue the insufficient investigation as a reason for reversal of the conviction. Although *res judicata* may bar Keith from now raising the issue of ineffective assistance of trial counsel, it does not bar his claim based on ineffective assistance of posttrial counsel. See *Pitsonbarger*, 205 Ill. 2d at 456; see also *People v. Orange*, 168 Ill. 2d 138, 167 (1995) ("Rules of waiver and *res judicata* will be relaxed where the facts relating to the issue of counsel's incompetency do not appear on the face of the record."). Thus, Keith has overcome the first hurdle for advancing the postconviction petition to an evidentiary hearing on his claim that he received ineffective assistance of counsel: he has sufficiently shown cause for failing to raise the issue earlier, because he did not know about the witness his attorney apparently failed to interview, and he sufficiently supported his assertion that his posttrial counsel provided objectively unreasonable assistance by failing to discover trial counsel's insufficient investigation.

¶ 55    We turn, then, to the second hurdle. We must determine whether the record sufficiently supports Keith's assertion that posttrial counsel's errors had prejudicial effect. Does the record show that posttrial counsel's apparent failure to discover that trial counsel apparently failed to interview Tribett, and posttrial counsel's failure to raise insufficient investigation as grounds for reversal, could have affected the result of posttrial proceedings? Does the record support the assertion of prejudice well enough to warrant an evidentiary hearing on Keith's claim that he received ineffective assistance of posttrial counsel?

¶ 56    Of all the witnesses to the shootings, only Tribett, in his affidavit, said he saw the shooters well enough to identify them. Tribett swore that he knew Keith from the neighborhood, and Keith was both smaller and lighter skinned than either of the shooters. Tribett swore that Keith did not shoot the victims. But no one–no police officers, no investigators, no prosecutors, and no defense counsel–spoke to Tribett after he told the police officer at the scene that he could identify the shooters. Because the prosecution presented a very weak case against Keith, dependent upon highly questionable testimony from McDermott, an admitted perjurer, about Keith's purported confession, Tribett's testimony very likely would have changed the result of the trial. If posttrial counsel had raised the failure to interview Tribett as grounds for finding that trial counsel provided ineffective assistance, after properly preserving the issue with an appropriate posttrial motion, this court likely would have reversed the conviction on the direct appeal. Thus, Keith has shown cause for his failure to raise this claim for ineffective assistance of counsel earlier, and prejudice from his counsel's unprofessional errors. *Pitsonbarger*, 205 Ill. 2d at 460-64. On remand, the trial court should hear evidence on the charge that Keith's posttrial counsel provided him ineffective assistance of counsel when that attorney failed to raise insufficient investigation as a further ground for finding that trial counsel provided ineffective assistance. By focusing on the most obviously prejudicial aspects of counsels' unprofessional errors, we do not intend to foreclose Keith from presenting any other evidence to support his claim that trial

and posttrial counsels provided ineffective assistance.

¶ 57                                Coerced Statements

¶ 58     Next, Keith contends that new evidence requires a retrial because it shows that police coerced any statements they obtained from him during the interrogation at Area 2. For the new evidence to warrant an evidentiary hearing on the successive postconviction petition, Keith must meet the cause-and-prejudice test. 725 ILCS 5/122-1(f) (West 2006).

¶ 59     At the trial, Keith and Audrey testified that police questioned him after Audrey told police she had contacted an attorney to represent him and after she left the interrogation room. Keith swore he never agreed to answer questions in his mother's absence. For evidence that police did not coerce a statement from Keith in violation of his constitutional rights, the State relied on McDermott's testimony that Audrey never mentioned getting an attorney for Keith and Keith initiated a conversation after Audrey left the interrogation room. According to McDermott, Keith said he would tell police the truth, but not with his mother in the room. No other witness said Keith initiated further discussions with police officers after Audrey left the interrogation room.

¶ 60     In 2006, special prosecutors reported about a pattern of criminal conduct committed by officers at Area 2, including McDermott. The special prosecutors specifically reported that they found convincing evidence, sufficient to prove guilt beyond a reasonable doubt, that McDermott battered suspects and committed perjury about the suspects' alleged confessions. Because the special prosecutors did not publish their findings until 2006, Keith has shown cause for failing to present the evidence in any prior proceeding. See *People v. Wrice*, 406 Ill. App. 3d 43, 52 (2010), *aff'd as modified*, 2012 IL 111860.

¶ 61     To meet the prejudice prong of the cause-and-prejudice test, Keith must show that the absence of the new evidence so infected the trial that the resulting conviction violated due process. *People v. Shellstrom*, 216 Ill. 2d 45, 56 (2005). For new evidence to show prejudice that warrants a new trial, "the evidence (1) must be of such conclusive character that it will probably change the result on retrial; (2) must be material to the issue, not merely cumulative; and (3) must have been discovered since trial and be of such character that the defendant in the exercise of due diligence could not have discovered it earlier." *People v. Orange*, 195 Ill. 2d 437, 450-51 (2001). We have already found that Keith could not have discovered the special prosecutor's report about McDermott's past misconduct before the special prosecutor published the report. Because no one admitted to McDermott's prior perjury, the evidence is not merely cumulative. Thus, Keith has sufficiently shown prejudice if the record supports his assertion that evidence of McDermott's prior perjury probably would change the result on retrial.

¶ 62     The report strongly corroborates Keith's and Audrey's testimony that Keith did not make any statement about the shooting voluntarily. The evidence of McDermott's perjury in similar cases involving alleged confessions significantly shifts the balance of credibility in the contest between McDermott's testimony and Keith's and Audrey's testimony about the voluntariness of his statements. Audrey testified that a police officer threatened to arrest her if she attempted to return to the room where other officers were interrogating her son, who

-10-

was 15 years old at the time of the interrogation. Her absence from the interrogation room gave police an excuse for bringing in a youth officer, who testified at the motion to suppress that Keith confessed. If the court had lent any credence to Audrey's testimony, and if the court had taken appropriate care to assure that police coercion did not produce Keith's statements, the court should have suppressed Keith's statements. See *People v. Griffin*, 327 Ill. App. 3d 538, 545 (2002). We find that the new evidence of McDermott's perjury probably would change the result of the motion to suppress Keith's statements. See *Orange*, 195 Ill. 2d at 450-51. Without testimony from prosecution witnesses who said that Keith confessed to the crimes, the State had no case against Keith at all. Thus, we find that Keith has shown both cause and prejudice. See *Wrice*, 406 Ill. App. 3d at 53, *aff'd as modified*, 2012 IL 111860.

¶ 63      The State argues that *res judicata* bars relitigation of the issue of whether Keith voluntarily confessed, as this court considered the voluntariness of the alleged confession on the direct appeal. However, the pervasive pattern of criminal conduct by police officers at Area 2 has led courts to reconsider the voluntariness of alleged confessions in several prior cases, despite the *res judicata* effect of earlier decisions in those cases. See *People v. Patterson*, 192 Ill. 2d 93, 139-45 (2000); *People v. King*, 192 Ill. 2d 189, 193-99 (2000); *People v. Cannon*, 293 Ill. App. 3d 634, 640 (1997). The same criminal conduct by police leads us, too, to reconsider the issue despite this court's uninformed consideration of the voluntariness of the confession on the direct appeal. When this court considered the issue of whether Keith made any statements voluntarily, this court did not have access to the 2006 special prosecutor's report. Because Keith showed both cause for his failure to present the special prosecutor's report at any earlier stage of proceedings and prejudice due to the lack of this evidence, we reverse the dismissal of Keith's postconviction petition and remand for an evidentiary hearing for the trial court to consider the effect of McDermott's perjury and other crimes on the motion to suppress.

¶ 64                                  Perjured Testimony

¶ 65      Keith presented Keller's affidavit to prove that the prosecution used perjured testimony to obtain the conviction. Keith showed cause for failing to present the affidavit with his first postconviction petition, as Keller at that time had not admitted that he lied under oath. See *People v. Smith*, 352 Ill. App. 3d 1095, 1100 (2004).

¶ 66      A conviction obtained by the knowing use of perjured testimony violates the defendant's right to due process. *People v. Olinger*, 176 Ill. 2d 326, 345 (1997). This court should set aside any conviction so obtained if the defendant shows "any reasonable likelihood that the false testimony could have affected the jury's verdict." *Olinger*, 176 Ill. 2d at 345. Even if the prosecutors did not know the police officers coerced Keller into lying at trial, the use of the perjured testimony violated Keith's right to due process if police knew about the perjury. "In order to establish a violation of due process, the prosecutor actually trying the case need not have known that the testimony was false; rather, knowledge on the part of any representative or agent of the prosecution is enough." *Olinger*, 176 Ill. 2d at 348. "[T]he prosecution is charged with knowledge of its agents, including the police." *Smith*, 352 Ill.

App. 3d at 1101. Because of the discussion with police and the coercion described in Keller's affidavit, police had reason to know that Keller lied at trial.

¶ 67     We have one significant indication that Keller's testimony could have affected the verdict: after the first trial, when Keller did not testify, the jury reached no verdict. After the second trial, with Keller's testimony, the jury found Keith guilty. The State points out that several prosecution witnesses testified at the first trial and not at the second trial, and one shooting victim testified at the second trial but not at the first. However, that witness did not in any way connect Keith to the shooting. Also, Keith's jury at the second trial heard some of the evidence admitted against his codefendant, Dove, who was not involved in the first trial. But Keller's testimony stands as the most significant difference between the evidence at the first trial and the evidence against Keith at the second trial.

¶ 68     Keller's testimony has particular significance because the State relied on gang retaliation as the motive for the crimes. At the first trial, the only evidence that Keith belonged to the Vice Lords came from the testimony of prosecution witnesses who claimed to have heard from Keith himself that he joined the gang. Keith, partially corroborated by Audrey, consistently denied that he made any confession or ever said he belonged to the Vice Lords. Keller, at the second trial, was the only Vice Lord ever to testify that Keith, too, belonged to the gang. Keller's testimony provides the most convincing connection between Keith and the motive for the crime. Therefore, we find that Keith has presented sufficient evidence to require an evidentiary hearing on his claim that the State used perjured testimony to obtain the convictions.

¶ 69                                         *Brady* Violation

¶ 70     Finally, Keith argues that the prosecution violated his right to due process when it withheld evidence that McDermott perjured himself in other cases, and McDermott particularly lied under oath to support prosecutors' arguments that defendants had voluntarily confessed to crimes. The United States Supreme Court, in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), held that the due process clause requires prosecutors to inform the defense of any evidence favorable to the defense. If prosecutors had disclosed the evidence that McDermott committed perjury in other cases, defense counsel may have used the evidence to persuade the trial court to disbelieve McDermott's crucial testimony (1) that Keith voluntarily initiated discussions with the police after his mother left the interrogation room, and (2) that Keith said he would tell the truth only if he could speak in his mother's absence. If the court disbelieved McDermott's testimony, it probably would have suppressed all of the testimony about a purported confession given by Keith, a minor, after police officers prevented his mother from entering the room during the interrogation. See *Griffin*, 327 Ill. App. 3d at 545. Without the testimony about a confession, the court should have directed a verdict for acquittal. Evidence of McDermott's perjury in similar cases would have helped the defense.

¶ 71     Despite the critical nature of the evidence that McDermott committed perjury in similar circumstances, the State contends it had no duty to disclose the evidence. Our supreme court's decisions in *Orange*, 195 Ill. 2d 437, and *People v. Mahaffey*, 194 Ill. 2d 154 (2000), *overruled on other grounds in People v. Wrice*, 2012 IL 111860, ¶ 75, control our disposition

-12-

of the issue. The defendants in *Orange* and *Mahaffey*, like Keith, claimed that police coerced them to make statements about crimes and that the prosecution violated *Brady* when it failed to disclose evidence of the pattern of torture and perjury committed by police at Area 2. While the defendant in *Orange* could not identify the officers who tortured him, the defendant in *Mahaffey* named his torturers, and their names appeared in numerous reports of similar crimes committed by police. The defendant in *Orange* argued that "the State [could] not claim that it lacked knowledge of the abuse because under *Kyles v. Whitley*, 514 U.S. 419, 131 L. Ed. 2d 490, 115 S. Ct. 1555 (1995), knowledge by any agents of the State, such as police officers, is imputed to the State." *Orange*, 195 Ill. 2d at 456. The *Orange* court rejected the defendant's argument and stated:

"In *Mahaffey*, we considered a similar argument about the State's duty to disclose pattern and practice evidence of coercive activities at Area 2. *Mahaffey*, 194 Ill. 2d at 171-74. In finding that no *Brady* violation occurred in that case, the court noted that the documents relied upon by the defendant in support of his claim were not in existence at the time of his suppression hearing and the defendant made no showing that the information contained within the documents was available to the State at the time of the hearing. *Mahaffey*, 194 Ill. 2d at 173. The court stated that 'any apparent nexus between alleged incidents of abuse of other suspects by Area 2 officers and defendant's claims did not arise until several years after defendant's suppression motion, and it was only at that later time that investigations were initiated into interrogation practices at Area 2. Therefore, defendant cannot properly claim that the State violated the *Brady* rule by failing to disclose information that was unavailable ***.' *Mahaffey*, 194 Ill. 2d at 174.

Here, the defendant relies on essentially the same documents as the defendant in *Mahaffey* to support his claim. *** We do not believe that, under the facts of the present case, the rule in *Brady* requires the prosecution to disclose information about misconduct in unrelated cases known only to individual police officers where the nexus between the other cases of alleged abuse and the defendant's case was not known until years after the defendant's trial. Under the circumstances, we find that the State did not violate the *Brady* rule ***." *Orange*, 195 Ill. 2d at 457-58.

¶ 72    In *Kyles*, 514 U.S. at 437-39, the United States Supreme Court held that *Brady* required disclosure to the defense of any information favorable to the defense, if any individual police officer knew the information. Police officers at Area 2, including McDermott, knew about the perjury they committed to persuade juries and courts that suspects had voluntarily confessed. While we do not see how to reconcile *Orange* and *Mahaffey* with *Kyles*, we recognize that our supreme court believed its holding in *Orange* did not conflict with *Kyles*. Because *Orange* binds this court, we hold that the trial court on remand need not hear evidence concerning the State's withholding from the defense of evidence favorable to the defense. We note that the Post-Conviction Hearing Act permits partial dismissals of postconviction petitions at this stage of proceedings. *People v. Lara*, 317 Ill. App. 3d 905, 908 (2000).

¶ 73                    CONCLUSION

¶ 74     In this case, we find that most of the evidence Keith presented in support of his successive postconviction petition shows the weakness of the State's case against Keith. Jermaine's affidavit and Keller's affidavit include some exculpatory evidence, but that evidence merely corroborates Keith's testimony at trial that he never joined the Vice Lords, so it is cumulative to the evidence already before the court. Only Tribett's affidavit counts as noncumulative evidence that Keith did not commit the shootings. But the State listed Tribett as a witness before trial, so evidence of what Tribett said he saw does not count as newly discovered evidence. Therefore, the trial court correctly decided not to hear evidence on Keith's claim that newly discovered evidence shows he did not commit the crimes.

¶ 75     But the trial court should have held an evidentiary hearing on Keith's claim that new evidence, showing that McDermott lied under oath about other interrogations and statements suspects made at Area 2 police headquarters, would have led the court to suppress all of the testimony, from police officers and an assistant State's Attorney, that Keith confessed to the crimes. The trial court also should have heard evidence on Keith's claims that the State used perjured testimony to obtain the conviction, and his trial and posttrial counsel provided ineffective assistance, especially because both attorneys failed to interview the only witness who claimed he saw the shooters well enough to identify them and that witness swore Keith did not shoot the victims. Finally, following *Orange* and *Mahaffey*, we hold that the trial court on remand need not consider evidence that the State violated its duty to give defense counsel evidence that could have helped Keith defend himself against the charges. Therefore, we affirm the trial court's dismissal of Keith's claim that new evidence shows that he did not commit the crimes, and that the State withheld evidence favorable to the defense. We reverse the trial court's dismissal of the petition based on Keith's presentation of new evidence that the State used perjured testimony, both at the suppression hearing and at trial, to obtain the conviction, and that his trial and appellate counsel provided ineffective assistance.

¶ 76     Affirmed in part and reversed and remanded in part.


¶ 77     JUSTICE MURPHY, specially concurring.

¶ 78     I agree with the decision to reverse and remand this matter for a hearing on defendant's claims concerning his allegedly coerced statements by police and for his ineffective assistance of counsel claim. Though my reasoning departs from that of the majority opinion in some areas, I concur with the judgment. I write separately to provide my reasoning for reversal and because I believe it is important to discuss the facts available to trial counsel at the time of trial in reconsidering the ineffective assistance of counsel claim.

¶ 79     I concur that the particular facts of this case support defendant's argument that the newly discovered evidence of police misconduct at Area 2 supports our reversal and remand for a hearing. I am not so certain that the report "strongly corroborates" the testimony of defendant and his mother that he did not make any inculpatory statement. *Supra* ¶ 62. However, I share concerns regarding defendant's statement and find the totality of the facts lead to the conclusion that a trier of fact should consider this issue.

-14-

¶ 80    Several courts have found that similar allegations of widespread police misconduct support an evidentiary rehearing on a suppression motion based on claims of police brutality. *People v. Patterson*, 192 Ill. 2d 93, 145 (2000); *People v. King*, 192 Ill. 2d 189, 198-99 (2000); *United States ex rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1095 (N.D. Ill. 1999). As the State notes, generalized claims of abuse without a direct link to the defendant's case to specific abuses are insufficient to support a claim of coercion. *People v. Anderson*, 375 Ill. App. 3d 990, 1007 (2007). Further, *Maxwell*, *Patterson*, and *King* all included allegations and evidence of methods and abuse consistent with the egregious activity uncovered by the reports and cases cited by defendant. In those cases, each defendant provided consistent claims of abuse "strikingly similar" to the abuses unearthed by the prior investigations, including the same officers and the same methods of abuse and torture. See *Patterson*, 192 Ill. 2d at 145.

¶ 81    In the instant matter, while there are not "strikingly similar" claims of physical abuse, I believe there are sufficient facts to warrant a hearing. I agree that the evidence at trial was not overwhelming. There was no videotaped confession. There was no signed written statement provided by defendant. Nor were any contemporaneous notes provided to support the statement, only the testimony of the officers and assistant State's Attorney and their subsequent notes. Further, Keller's recanted testimony and the newly discovered reports of systemic abuse provide support for defendant's claims that his statement should be suppressed.

¶ 82    This is not to say that I dismiss the testimony provided at the suppression hearing. In fact, that the State presented not only McDermott's testimony, but that of Officer Wilson as well as the youth officer and assistant State's Attorney involved carries much weight. While the majority opinion points to the damning evidence against McDermott in the newly discovered reports as well as the inclusion of Wilson's name, there is not such evidence against these other two witnesses. Nor is there strikingly similar evidence in the instant case. Therefore, this is indeed a difficult case, but considering all of the evidence and noting that *Patterson* specifically lists evidence of physical harm as only one factor to consider in this calculus, I concur that this new evidence is sufficient to relax *res judicata* and allow a hearing on the circumstances of his confession. See *Patterson*, 192 Ill. 2d at 145; *People v. King*, 192 Ill. 2d 189, 198 (2000); *People v. Cannon*, 293 Ill. App. 3d 634, 640 (1997).

¶ 83    Finally, I also concur that defendant's claim of ineffective assistance of trial counsel merits an evidentiary hearing. Defendant argues in his brief that the affidavits of Tribett, Bates, and Muhammad, the additional evidence concerning Bates' alleged involvement in the shooting, and the 2003 ARDC suspension of defendant's counsel are all newly discovered evidence that demonstrate counsel's failure and prejudice against defendant. The State argues that defendant's claim is barred by *res judicata* and waiver because defendant raised the issue of ineffective assistance of trial counsel on direct appeal and failed to raise this issue. *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002). The majority opinion agrees with respect to trial counsel, but overcomes the issues of *res judicata* and waiver by considering whether defendant's appellate counsel was ineffective. Most of defendant's arguments here are nonstarters, but the majority rightfully focuses its analysis on trial counsel's alleged failure to investigate Tribett. However, I disagree with the ultimate finding

that the issue of appellate counsel's ineffective representation should be heard on remand.

¶ 84    While defendant advanced a claim that appellate counsel was ineffective in his petition, his brief on appeal only asserts that he suffered ineffective assistance of trial counsel. I believe that the facts and case law allow us to relax the waiver rule in this case to consider trial counsel's performance. *People v. Orange*, 168 Ill. 2d 138, 149 (1995). I agree that the facts of this case are not overwhelming and that additional evidence in support of defendant's case could have tipped the scales. Taking Tribett's affidavit as true, he was not contacted by defendant's attorney or any other party after his interviews with the police and would testify that defendant was not involved in the shooting. This supports defendant's successive postconviction petition claim and relaxing of waiver and *res judicata*. However, after careful review of the record, I feel it is imperative to note the following facts that must be considered when reviewing Tribett's testimony.

¶ 85    Tribett is listed on the original police report but the narrative of the incident does not refer to him. In a supplementary report, specifically a field investigation progress report dated the same date of the shooting, provides an account of Tribett's statement to investigating officer Detective Rowan. Tribett related that he was walking north on South Ellis Avenue and was in the middle of the 7800 block when he heard 11 to 12 shots. Tribett turned around and saw people running from the corner and he then proceeded to return to the corner because his brother-in-law was there. He discovered that his brother-in-law and another man had been shot. Regarding possible offenders, Tribett related that when he turned around he observed a black male running from the scene and was sure that he could identify him if he saw him again. Tribett's home address and phone number are listed on this supplementary report.

¶ 86    A general progress report, also dated July 22, 1992, prepared and signed by Detective Hoban, similarly details results of an interview with Tribett. According to this report, Tribett was midblock northbound on South Ellis Avenue when he heard 11 to 12 shots, turned around and saw a number of people running away from the corner. Tribett related that as he approached the corner he observed a male running eastbound from the corner. Tribett did not recognize the male as a regular on the street but thought he would be able to identify him. Notes from Officers McDermott and Boylan noted that Tribett was near 7834 South Ellis Avenue when he heard the gunshots and observed one male subject running eastbound across a vacant lot, but they had no other information and added that Tribett would not be able to identify the offender.

¶ 87    Again, with the understanding that we take Tribett's affidavit as true, his statements of 2006 and 2007 that he saw multiple shooters, that he could positively say that defendant was not one of them, and that he remained at the same address and was not contacted by anyone on behalf of defendant support relaxing of the doctrines of waiver and *res judicata*. Based on the totality of the facts of record and this testimony, I agree that a hearing is warranted on this claim. However, also based on these facts and testimony, I note that careful review of the record must be undertaken to determine the propriety of the actions of defendant's attorney at the time of the investigation and trial.

¶ 88      JUSTICE SALONE, specially concurring.

¶ 89      I agree with the decision reached by the majority in this case. I write separately, however, to address the ongoing misconception that a so-called juvenile officer is "charged with protecting" the rights of juvenile arrestees. *People v. Gardner*, 282 Ill. App. 3d 209, 217 (1996). This misconception has made its way into Illinois case law; however, I have found no support for it in the law. To the contrary, the relevant statutory authority as well as local police protocol and common sense and experience weigh against the presumption. I will address each of these in turn.

¶ 90      Initially, I note that the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2010)), which defines the juvenile police officer position and prescribes its duties, does not charge the officer with protecting the rights of juvenile arrestees. The Act defines a juvenile officer as a sworn police officer who has "completed the necessary juvenile officers training as prescribed by the Illinois Law Enforcement Training Standards Board" (705 ILCS 405/1-3 (West 2010)), without any reference to the specifics of that training or its requirements.

¶ 91      Further, the duties of a juvenile officer, with respect to juvenile arrestees, are prescribed in section 3-8(3) of the Act, which reads:

"(3) The juvenile police officer may take one of the  following actions:

(a) station adjustment with release of the minor;

(b) station adjustment with release of the minor to a parent;

(c) station adjustment, release of the minor to a parent, and referral of the case to community services;

(d) station adjustment, release of the minor to a parent, and referral of the case to community services with informal monitoring by a juvenile police officer;

(e) station adjustment and release of the minor to a third person pursuant to agreement of the minor and parents;

(f) station adjustment, release of the minor to a third person pursuant to agreement of the minor and parents, and referral of the case to community services;

(g) station adjustment, release of the minor to a third person pursuant to agreement of the minor and parent, and referral to community services with informal monitoring by a juvenile police officer;

(h) release of the minor to his or her parents and referral of the case to a county juvenile probation officer or such other public officer designated by the court;

(i) release of the minor to school officials of his school during regular school hours;

(j) if the juvenile police officer reasonably believes that there is an urgent and immediate necessity to keep the minor in custody, the juvenile police officer shall deliver the minor without unnecessary delay to the court or to the place designated by rule or order of court for the reception of minors; and

(k) any other appropriate action with consent of the minor and a parent." 705 ILCS 405/3-8 (West 2010).

¶ 92      Initially, I note that no portion of the statute mandates any conduct by the officer. Indeed,

the permissive language, that the officer may take one of the actions listed, shows that the legislature did not intend to mandate that any of the aforementioned actions be taken. *People v. Reed*, 177 Ill. 2d 389, 393 (1997). Instead, the officer may elect to do any of the enumerated acts. Moreover, none of the actions identified address the role of the juvenile officer during the interrogation of a juvenile arrestee. None of the suggested actions advise the officer that he is to perform the functions of a concerned adult on behalf of the minor. Thus, none of the plain language in the Act suggests that the juvenile officer is required or charged with protecting the rights of juvenile arrestees or acting as a concerned adult on their behalf.

¶ 93       In my view, the opposite conclusion is more reasonable. Subsections (a) through (j) governing juvenile officers' suggested conduct can be summarized as directing the juvenile officer to release the juvenile on his own or turn him over to a parent, guardian, or court-designated location. No part of the directions from the legislature instruct the juvenile officer to consider the interest of the minor or act on behalf of the minor's interest. The legislature did not require, or even suggest, that the juvenile officer instruct the minor on his rights or make any recommendations to the minor regarding his rights or interest during police interrogations. Thus, the juvenile officer does not serve the role of a concerned adult or *in loco parentis.* At best, the officer serves as a transfer agent who should attempt to find a concerned adult for the juvenile.

¶ 94       Indeed, the only additional part directing the officer's conduct, subsection (k), requires the consent of the minor's parent. When read together with section 3-8(2) of the Act, which limits the conduct of arresting officers' with juvenile arrestees, it becomes readily apparent that the legislature sought to insulate juveniles from the typical criminal interrogations done with adult arrestees. Therefore, there is no explicit statutory authority, nor is there a reasonable reading of the Act to suggest the legislature's implicit intent that juvenile officers act as concerned adults for, or protect the rights of, juvenile arrestees. In my view, the opposite conclusion appears more reasonable when reading the Act as a whole. As recently as February of 2012, Senate Bill 3195 was introduced which would create a presumption that juvenile statements were inadmissible in criminal homicide prosecutions unless the juvenile was given access to counsel for the duration of the interrogation. That bill has been postponed and held in the Senate Criminal Law Committee amid concerns that giving juveniles such protections would thwart investigations and frustrate prompt criminal investigations.

¶ 95       Similar to the dearth of legislative support for the proposition, I also have found no support within the executive branch. As noted above, the Illinois Law Enforcement Training Standards Board is statutorily charged with prescribing standards for training of juvenile officers. However, no published information from that board is available which supports the premise that officers are trained in, or required to protect the rights of juvenile arrestees. By way of example, General Order G04-03(VI)(c), of the Chicago police department, states that, "Before accepting any admission or statement of a juvenile, the juvenile will be advised that their case may be transferred to Criminal Court where they will be prosecuted as an adult. A JUVENILE **SHOULD** BE WARNED AND QUESTIONED ONLY IN THE PRESENCE OF AN ADULT (parent, other relative, friend) **IF** SUCH AN ADULT CAN BE

LOCATED." (Emphases in original.)[1] General Order G04-03(VI)(E)(1) instructs officers that, "If the individual requests advice as to whether or not they should decide to answer questions, Department members are not permitted to advise the individual."

¶ 96    In reviewing the language of the two orders, the policy provides permissive language with regard to providing a juvenile arrestee with a concerned adult. However, the language regarding advice on answering questions, *e.g.*, making an admission during an interrogation, expressly prohibits any officer from providing advice as to the most critical question before a juvenile arrestee, which is whether or not to make any statement. A juvenile officer is still a police officer and subject to the general orders of the department. As such, any officer providing advice that a parent or concerned adult would provide, in regard to what, if anything, the juvenile should say during an interrogation, would be in direct violation of the general order and subject to discipline. As noted, I have not found any statewide directive regarding the role of a juvenile officer as a guardian of the juvenile's rights or concerned adult. However, I find it highly unlikely that the Chicago police department's procedure would be in violation of a broader statewide mandate. In my view, the alternative conclusion is more likely, that the Chicago police department policy is at least consistent with, if not the same as, any statewide instructions. If so, the policy of the executive branch is far from supportive of the notion that juvenile officers are charged with protecting the rights or interests of the juvenile. In my view, the executive branch and the juvenile officer's role, may, in many cases, be contrary to the interest of the juvenile arrestee.

¶ 97    Lastly, the notion that juvenile officers act as concerned adults for juvenile arrestees is contrary to common sense and understanding. Juvenile officers are police officers. As such, they are tasked with investigating crimes and arresting people believed to have committed crimes. The fact that a minor finds himself arrested by a police officer and then is interrogated without the presence of a parent or concerned adult is disconcerting. If it were not so, the legislature would not put such requirements on seeking to find a parent for a juvenile arrestee. As such, expecting the juvenile officer, while remaining a part of the police force, to serve the dual role of concerned adult for a suspected criminal is disingenuous at best and nearly impossible. Moreover, in the cases where it would be most needed, *i.e.*, when an interrogation is particularly intense, suggesting that the juvenile officer intervene is extraordinarily contrary to common experience.

¶ 98    Even the judicial branch, while suggesting that the juvenile officer serves the role of a concerned adult role, does not require the juvenile officer to act in any way. In *People v. Lee*, 335 Ill. App. 3d 659, 668-69 (2002), this court held that defendant's claim that his confession was involuntary because the youth officer failed to protect his rights was without merit. The court reasoned that because youth officers are not required to be present during an interrogation and the record was silent on the role the youth officer played during defendant's interrogation, the supposed failure by the youth officer did not render his confession involuntary. Thus, not even the judiciary is consistent in holding that a youth/juvenile officer

---

[1]The order then refers officers to Special Order S06-04, entitled "Processing of Juveniles and Minors Under Department Control," which recapitulates section 3-8 of the Act.

serves the role of a concerned adult. The suggestion that the officer does serve in such a capacity carries with it sixth amendment considerations, which have never been addressed, largely because no affirmative duty has been established, through the legislative, executive, or judicial branch.

¶ 99 For these reasons, I find the notion that a juvenile officer is "charged with protecting the juvenile's rights" to be dangerously disingenuous and damaging to the integrity of the judicial process.