NOTICE

Decision filed 04/30/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240548-U

NO. 5-24-0548

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Union County. |
| | ) | |
| v. | ) | No. 22-CF-185 |
| | ) | |
| ROBERTO L. ALANIZ, | ) | Honorable |
| | ) | Tyler R. Edmonds, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Sholar concurred in the judgment.

**ORDER**

¶ 1     *Held*: We grant appellate counsel's motion to withdraw and affirm the trial court's sentence where there exist no issues of arguable merit to be raised on appeal.

¶ 2     Following a jury trial, defendant, Roberto L. Alaniz, was found guilty of one count of aggravated battery and one count of aggravated assault. The trial court sentenced him to concurrent terms of five years and one year, respectively. He timely appealed; however, defendant's appointed appellate counsel, the Office of the State Appellate Defender (OSAD), concluded there was no reasonably meritorious argument that reversible error occurred. Accordingly, OSAD filed a motion for leave to withdraw as counsel on appeal and a supporting memorandum. See *Anders v. California*, 386 U.S. 738 (1967). OSAD notified defendant of its motion, and this court provided defendant with ample opportunity to file a response, but none was filed. After considering the

1

record on appeal and OSAD's motion and supporting memorandum, we agree that no meritorious argument could be presented for the proposed issues. Accordingly, we grant OSAD leave to withdraw and affirm the trial court's judgment.

¶ 3                                 BACKGROUND

¶ 4    On July 25, 2022, defendant was involved in an incident with Johnathan Turner and Sandy Roach at the AJ One Stop convenience store in Anna, Illinois. Defendant was arrested and on July 27, 2022, defendant was charged with two counts of aggravated battery in violation of section 12-3.05(c) of the Criminal Code of 2012 (720 ILCS 5/12-3.05(c) (West 2022)).

¶ 5    At trial, Turner testified that, on July 25, 2022, he and Roach went to the AJ One Stop to get sodas. As they entered, Turner saw defendant talking to a store employee. Defendant left the store but returned after a few minutes and confronted Turner. He "cussed" and "came up on" him. Turner tried to push him away, but defendant swung at him, first with his left hand, then with his right. When defendant swung with his right hand, he struck Turner in the neck with a sharp object. Turner suffered a painful, bleeding injury to his neck that left a scar. He reviewed the DVD of the surveillance footage and confirmed its accuracy.

¶ 6    Roach testified similarly to Turner about going to the AJ One Stop. She said that she and defendant had been in a romantic relationship for about eight years and had one child together. According to Roach, as she and Turner started to leave the store, defendant approached Turner and began pushing him, saying that he wanted to fight. Turner pushed him away, saying that he did not want to fight. Defendant then swung at Turner with his left hand, striking him in the neck with a long, silver object.As Turner pushed defendant, defendant started to swing at Turner again. Roach raised her right hand to intervene but was struck on the wrist, suffering a painful laceration in that area. The men fought for a few minutes longer before a customer told defendant to drop his

2

weapon. As defendant turned to leave, he punched Turner in the face, then left. Roach also reviewed the DVD of the security footage and confirmed its accuracy.

¶ 7    Roach and Turner also acknowledged that, on July 12, 2022, Turner had a verbal altercation with defendant at a house on Dewey Street where Roach lived with Turner and where Roach previously lived with defendant. Turner and Roach denied that there was physical contact during the incident, which took place after defendant attempted to break in.

¶ 8    Jessie Griffin, Turner's second cousin, testified that he was outside the AJ One Stop on July 25, 2022. Defendant came out of the store and said that he was going to cut someone's throat and kill him. Defendant appeared agitated and returned to the store. Griffin noticed something in defendant's back pocket. A short time later, defendant came out of the store and ran behind it. Shortly thereafter, Turner came out holding his neck and saying that defendant had cut him.

¶ 9    Dipak Patel, the owner of the convenience store, testified that the store was open to the public and open for business on the day of the incident. The store had a surveillance system that was working properly on that date. He did not know how to copy the surveillance video to a DVD, so Anna police officer, Jason Leek, used his cell phone to record the footage directly from the monitor.

¶ 10    Officer Leek testified that he spoke with Turner and Roach, reviewed surveillance footage of the altercation, and arrested defendant later that day. As he did, he found a "multi-tool," a combination hammer-screwdriver, in defendant's pocket. Leek asked defendant where the knife was. Defendant said that he did not have a knife but "used the multi-tool." The DVD of the surveillance video was played to the jury. The State stopped the video at certain points and asked Leek to explain what they were watching. During cross-examination, Leek confirmed that the multi-tool did not appear to have blood on it. He further confirmed that the multi-tool was not

3

submitted to the crime lab. On redirect, the State asked Leek based on his "viewing that video, who is the aggressor?" Leek responded saying, "Mr. Alaniz," "[w]ithout question." He further confirmed that Turner appeared to be acting in self-defense and agreed the multi-tool was not submitted to the crime lab because he felt that he had an overwhelming amount of evidence and did not need to submit the multi-tool for analysis. On recross-examination, Leek again confirmed that when he arrested defendant and asked where the knife was, defendant offered the multi-tool and said that was what he had used.

¶ 11     Following Leek's testimony, the State rested. Defense counsel moved for a directed verdict and the court denied the motion. The court then addressed the State's *Montgomery* motions related to the admissibility of prior felony convictions for proposed defense witnesses Shawn Worley and Kelle O'Malley. It denied the motion as to Mr. Worley and granted the motion as to Ms. O'Malley.

¶ 12     Shawn Worley acknowledged that he was in handcuffs and agreed he currently had legal issues. He testified that he was living with his girlfriend Whitney Patton on July 12, 2022, and that Roach and Turner, along with defendant's children, were also living at the home. He stated that defendant and Roach previously lived there together but defendant vacated the premises after an altercation. On July 12, 2022, defendant showed up at the house wanting to see his child. Worley, Patton, and Roach were at the house. Roach would not let defendant in the house. Turner arrived at the house and defendant and Turner had words. Worley stated that after the verbal altercation, Turner pulled a knife on defendant. After defendant taunted Turner to stab him, Turner threw the knife on the trampoline and Roach stated she was calling the police. Worley tried to discourage Roach from making the call, but she made it anyway. Turner went into the house. Patton grabbed the knife and hid it somewhere in the house and then the police showed up. Worley stated he was 100 percent certain that he saw a knife in Turner's hands and described it as "a little pocket knife,"

"[a] fold-out one." Defendant was still there when the police were called. On cross-examination, Worley stated that Eian Mull was also present during the altercation. Mull attacked defendant prior to Turner pulling a knife. After Mull's altercation with defendant, Mull left.

¶ 13     Kelle O'Malley confirmed that she previously pled guilty to theft in 2014 and was working at AJ One Stop on the date of the incident. She worked there for about nine months prior to that date. She stated that defendant regularly came in to buy cigarettes, buy a drink, or go into the back of the store which held gambling machines. On the day in issue, O'Malley saw defendant outside when she went on her smoke break and offered defendant a drink and to smoke with her. When she walked around the corner, she passed Griffin, who also frequented the gaming room. Defendant did not join her for the smoke break. She did not hear defendant say anything to Griffin and if she heard him say something, she would have taken him aside. She stated that defendant was "struggling with his relationship" with Roach and was trying to keep his family together. She saw nothing of the altercation that happened inside.

¶ 14     Defendant testified that in mid-June, about two weeks after they split up, Roach invited him to stay with her and their son at a motel room. Although Roach had an order of protection (OP) against him at the time, she told him that she had dismissed it and was not planning to show up at the hearing to extend it. The three spent the night together, and defendant assumed that Roach wanted to reconcile. Roach did not appear at the OP hearing on July 12, 2022, and the OP was dismissed so defendant returned to his prior residence with Roach. He stated that his intention was to "see my child and to talk with [Roach], maybe kick out whoever was there that I didn't want there, like her boyfriend." When he arrived, Roach did not let him in. Thereafter, Eian Mull left the house, and seemed to "spear" defendant. Defendant grabbed Mull by the back of his neck and steered him away. After exchanging words with Mull, Mull walked over to the neighbor's house.

5

Then, two other men left the house and tried to get defendant to leave with them. However, defendant said, "no," that he had permission to come home and needed to get his stuff. The other two men eventually left without incident.

¶ 15 Defendant stated that he saw Turner coming from the back alleyway at "a high rate of speed." Defendant stated Turner was "saying some vulgar crap" and pulled out a knife. He told Turner that he had been cut four times in his life, and they had all been with bigger knives. He stated that Turner then "got scared and threw the knife on the trampoline." He and Turner then proceeded to get into a physical altercation and the women came out of the house saying they were going to call the police. Turner and the women went into the house and when defendant turned around, the police were there, and defendant went up to talk to Officer Adam Tripp to discuss what happened.

¶ 16 Defendant stated that on July 25, 2022, he was at the AJ One Stop waiting for Patton to provide him with money along with the titles to his boat and trailer. Defendant was standing at the counter talking to an AJ One Stop employee when Roach entered the store. After telling the employee that she was not his wife anymore, he winked at Roach. When Roach saw him, she stopped and then moved to where sodas and juice were kept in the cooler. He thought that maybe Patton told Roach he was there, and that Roach had come to talk to him.

¶ 17 Defendant stated that a minute or two later, Turner came in. Defendant testified that he said, "What's up, Bitch?" and Turner replied, "Oh, I'm going to catch up with you later and gut you like the pig that you are." Turner then headed toward Roach and defendant grabbed his backpack and walked out of the store. He saw a man he had never seen before on the left and walked off to the right to have a cigarette with O'Malley. He did not smoke with O'Malley because he was "more concerned about the situation with [Turner] *** and the comment that he made. And

6

I kind of wanted to confront him." He stated that he went back into the store so that whatever happened would be on camera. Defendant explained that when he used the word "confront," "honestly, I was pissed. I wanted to confront him as a man. You know, I wanted to confront him as, you know, he's taking—I feel like he's took my family away from me." He stated that he had no intention of harming Turner. He stated that he always carried the multi-tool in his corner pocket, but he had it in his hand when he entered the store because Turner pulled a knife on him two or three days earlier and that "he probably more than likely had that knife on him." He went into the store "[t]o confront him *** you know, bitch him out." He walked up to Turner and said, "If you are going to cut me, cut me now." Turner then shoved defendant. He stated that Turner pushed him more than once and took three swings at him before he did anything.

¶ 18   Defendant testified that when the altercation was over, the camera did not show him telling Turner to leave or Turner not leaving. Following a short scuffle, Turner came toward him again, put his phone down, and "lunge[d] toward" defendant. Defendant hit Turner, who lunged at him again, so defendant swung and hit Turner "as hard as [he] could with this backpack on." Thereafter, Turner picked up his items from the floor and defendant left the building. Defendant stated he did not "run away" because he had back surgery and did not have his bicycle. However, he did not stay because he was arrested after the incident on July 12, 2022, and figured Roach would have the cops believing her story.

¶ 19   On cross-examination, defendant admitted that he could have just walked away after he initially left the store. He agreed that he returned to the store with a weapon in his hands. He stated that his view of the video revealed that Turner was the aggressor. He did not call police when he felt threatened because his cell phone only had text messaging. He agreed he could have asked Ms. O'Malley for her phone. He stated that Roach should have left the store when she saw him there

because he was there first. Defendant agreed that he never saw Turner with a knife on July 25, 2022. Following defendant's testimony, defense counsel rested.

¶ 20    The State recalled Roach who testified that on July 12, 2022, Worley had not been residing at the residence for about three weeks and was not present on that date. The State also recalled Turner who testified that he did not call defendant a bitch or say anything about gutting him. Turner also confirmed that Worley was not residing in the home on July 12, 2022, and was not present at the residence on that date. The State advised the court that it had no other rebuttal witnesses.

¶ 21    Thereafter, defense counsel requested additional time to call Officer Tripp as a rebuttal witness and the court took a lunch recess. Following the recess, the parties presented the proposed jury instructions. Defense counsel submitted a proposed instruction on lesser included offenses. Defense counsel stated that it would be requesting that the definition of aggravated assault be included as to both Turner and Roach. Defense counsel also requested inclusion of a self-defense instruction. The State objected, but the court allowed the instruction. The parties also addressed the possible jury verdict forms. The State also objected to the lesser included offenses, but the court granted the motion and allowed for the lesser included offense of aggravated assault. The court advised defense counsel that if his witness was not available following the lunch recess, they would move into closing arguments.

¶ 22    Following the lunch break, defense counsel advised that Officer Tripp was on medical leave and unable to testify. Defense counsel moved for additional time to locate a witness that may have responded when Officer Tripp did on July 12, 2022. Counsel confirmed that he also spoke with Officer Leek who advised that he had no testimony to provide as to that date. Counsel stated that other officers were dispatched but there was no record of whether they arrived or not. Thereafter, the court stated it would deny the motion for recess and asked defense counsel if he

8

had any other witnesses. Defense counsel stated the only other person was Eian Mull who was in jail. The court asked if arrangements had been made to bring over Mull and defense counsel stated that arrangements had not been made because it "was not expected that the testimony given would be what it was." The court granted defense counsel leave to address that in his closing argument and defense counsel stated, "Okay."

¶ 23 The jury returned to the courtroom. Closing arguments were presented and the jury instructions were read. Thereafter, the jury found defendant guilty of aggravated battery against Turner and aggravated assault against Roach.

¶ 24 At sentencing, the State noted defendant's 2002 misdemeanor battery conviction, as well as a 2012 federal conviction for conspiracy to distribute heroin. The defense pointed out some mitigating factors, including that defendant should be able to see his daughter. In allocution, defendant accepted responsibility for going back into the store and confronting Turner and Roach. He explained that he was distraught from the breakup with Roach and his brother's suicide three months prior, although he also referenced Roach's repeated "lies." The court sentenced defendant to five years' imprisonment for aggravated battery and a concurrent 364-day jail term for aggravated assault.

¶ 25 Defense counsel moved for a new trial, arguing that the court erred by (1) denying him a continuance to secure Tripp and Mull as rebuttal witnesses, and (2) not sending the surveillance video back with the jury. The court denied the motion and defendant timely appealed.

¶ 26                                    ANALYSIS

¶ 27 On appeal, OSAD proposed four possible issues on appeal but concluded that none have even arguable merit. We agree.

9

¶ 28    The first issue was whether the State failed to prove defendant guilty beyond a reasonable doubt. On review, we ask whether, after viewing the evidence in the light most favorable to the State, any rational factfinder could have found the elements of the offense proved beyond a reasonable doubt. *People v. Ward*, 154 Ill. 2d 272, 326 (1992) (citing *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The factfinder is responsible for deciding the witnesses' credibility, weighing their testimony, and deciding on the reasonable inferences to be drawn from the evidence. *People v. Bull*, 185 Ill. 2d 179, 204-05 (1998). Reviewing courts do not substitute credibility assessments of the factfinder (see *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006)), and it is not our function to retry a defendant when considering a challenge to the sufficiency of the evidence of his guilt. *Collins*, 106 Ill. 2d at 261.

¶ 29    With respect to Turner, the State had to prove that (1) defendant knowingly caused bodily harm; (2) when defendant caused bodily harm, Turner was on or about a public place of accommodation; and (3) defendant was not justified in using the force that he used. 720 ILCS 5/12-3(a), 12-3.05(c) (West 2022). The State clearly proved the first two elements.

¶ 30    As to the first element, the evidence showed that Turner suffered bodily harm. He testified that he suffered a bleeding, painful wound to his neck as a result of defendant stabbing him with the multi-tool and the State introduced photos of his injuries. See *People v. Mays*, 91 Ill. 2d 251, 256 (1982) ("bodily harm" includes "some sort of physical pain or damage to the body, like lacerations, bruises or abrasions").

¶ 31    As to the second element, Patel, the owner of the AJ One Stop, testified that it was open to the public and was open for business when the incident happened. See *People v. Whitehead*, 2023 IL 128051, ¶ 27 ("public place of accommodation or amusement" means a place made available

10

to the public; thus, a parking lot outside a convenience store was a public place of accommodation (citing *People v. Lee*, 158 Ill. App. 3d 1032, 1036 (1987))).

¶ 32     The only element contested at trial was whether defendant was justified in using force. Defendant claimed that he acted in self-defense.

> "The elements of self-defense are: (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of force applied; and (6) the beliefs of the person threatened were objectively reasonable." *People v. Lee*, 213 Ill. 2d 218, 225 (2004).

The State has the burden of proving beyond a reasonable doubt that a defendant did not act in self-defense. *Id.* at 224. "However, a jury has discretion to reject a self-defense claim based on the probability or improbability of defendant's account, the circumstances of the crime, the testimony of the witnesses, and witness credibility." *People v. Brown*, 406 Ill. App. 3d 1068, 1081 (2011).

¶ 33     The evidence here, viewed in the light most favorable to the State, was more than sufficient for the jury to reject defendant's self-defense claim. Evidence showed that defendant left the store after Turner and Roach came in, then returned several minutes later, carrying a weapon. Turner testified that defendant approached him aggressively. When Turner shoved defendant to keep him away, defendant swung at him. The surveillance video confirmed this. It showed defendant returning to the store with a narrow silver object extended upward from his right hand. He walked directly toward Turner. The two exchanged shoves before defendant swung at him. Moreover, Griffin, who was outside the store when defendant first exited, heard defendant threaten to cut someone's throat.

11

¶ 34 Additionally, defendant admitted that he returned to the store with the multi-tool in his possession to confront Turner, although he insisted he intended only a verbal confrontation. He thought Turner might have had a knife based on the earlier incident but admitted that he did not see Turner with a knife on July 25. Thus, the jury could reasonably find that defendant was the initial aggressor and that there was no "imminent" threat of harm to him. Accordingly, we find the evidence sufficient to convict defendant of aggravated battery against Turner.

¶ 35 The foregoing analysis largely applies to aggravated assault against Roach as well. To sustain that conviction, the State had to prove that (1) defendant knowingly placed Roach in reasonable apprehension of receiving bodily harm; (2) when defendant did so, Roach was on or about a public place of accommodation; and (3) defendant was without lawful authority in using the force he used. 720 ILCS 5/12-1(a), 12-2(a) (West 2022).

¶ 36 Concerning the first element, the State could prove that Roach reasonably apprehended receiving a battery even though she never explicitly testified about her mental state. In *People v. Alexander*, 39 Ill. App. 3d 443, 446-47 (1976), the defendant threatened and swung a tire iron at one of the two complaining witnesses and was convicted of aggravated assault of the non-targeted complainant, Coleman. The court held that although

> "Coleman never expressly testified that he was in reasonable apprehension of a battery, the obvious adversary relationship between the complainant and the defendant, Coleman's proximity to [the defendant] who was wielding a tire iron over another complainant's head, the ongoing nature of the confrontation, and the conduct of requesting police assistance on four separate occasions during the course of the argument would support the *** inference of reasonable apprehension." *Id.* at 447.

Here, Roach was in the middle of the melee involving Turner and defendant's knife and a finding that Roach was in reasonable apprehension of receiving a battery during that altercation is easily acceptable. Further, as with the aggravated battery conviction, it was undisputed that the convenience store was a public place of accommodation and defendant's self-defense claim was equally unavailing with regard to Roach. Accordingly, we find sufficient evidence was presented to affirm defendant's conviction of aggravated assault against Roach.

¶ 37    The second proposed issue on appeal involves the trial court's denial of defense counsel's request for a continuance to locate Tripp or Mull as surrebuttal witnesses. "Once trial has started, the trial court may grant a reasonably brief continuance in the interest of justice." *People v. Gardner*, 282 Ill. App. 3d 209, 214 (1996) (citing 725 ILCS 5/114-4(f) (West 1992)). Whether to grant a continuance to secure a witness is within the trial court's sound discretion. *Id.* When reviewing the denial of such a request, we consider factors such as whether the witness's proposed testimony would have been material, whether the testimony might have affected the jury's verdict, and whether the absence of the witness prejudiced the defendant. *Id.* at 214-15.

¶ 38    "A defendant seeking a continuance to secure the presence of a witness must make an offer of proof of that witness' proposed testimony." *People v. Sargent*, 184 Ill. App. 3d 1016, 1022 (1989). Such offer will provide the trial court, opposing counsel, and this reviewing court "the nature and substance of the testimony defendant would have introduced." *Id.* at 1022-23. Here, no offer of proof was presented as to the testimony defense counsel hoped to elicit from either witness, and this court is left to speculate as to the testimony of both proposed witnesses. Under such circumstances, this court cannot consider the issue on review, and therefore, we agree that no reasonable argument can be presented for this issue.

13

¶ 39    OSAD's third proposed issue was whether the trial court erred by allowing Officer Leek to narrate the video while it played for the jury and to offer his opinion that defendant was the aggressor during the encounter. Here, we must note the Illinois law is well established in holding that to "preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion." *People v. Sebby*, 2017 IL 119445, ¶ 48. "Failure to do either results in forfeiture." *Id.* Here, defense counsel neither objected at trial nor raised this issue in the posttrial motion. Accordingly, the issue is forfeited.

¶ 40    We further note that an exception to the forfeiture doctrine is afforded under Illinois Supreme Court Rule 615(a), but only when plain error is established. *Id.*; see also Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The first step for consideration of plain error is to determine whether a clear or obvious error occurred at trial. *Sebby*, 2017 IL 119445, ¶ 49 (citing *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). Illinois Rule of Evidence 701 governs opinion testimony by a lay witness and provides as follows:

> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge ***." Ill. R. Evid. 701 (eff. Jan. 1, 2011).

¶ 41    Under the rule, a lay witness may testify about events depicted in a video although the witness did not personally observe the underlying events if the "testimony is rationally based on the perception of the witness" and such "testimony is helpful to a clear understanding of the witness's testimony or a determination of a fact in issue." *People v. Thompson*, 2016 IL 118667,

14

¶ 51. "An opinion as to what a video depicts is an opinion that a layperson could normally form from observing the video." *People v. Gharrett*, 2016 IL App (4th) 140315, ¶ 72. Whether a witness's testimony was rationally based on his or her perception does not depend on whether he or she had personal knowledge of the actual people, actions, or objects depicted in the video. *Id.* Instead, the relevant perception is his perception of the video. *Id.* Here, Officer Leek's testimony was provided while the video was stopped to elucidate what was shown in the video and therefore was proper pursuant to *People v. Johnson*, 218 Ill. 2d 125 (2005). Accordingly, no error can be found.

¶ 42    However, Officer Leek's legal conclusion that defendant was the aggressor is not subsumed by the *Johnson* analysis. "[A] lay witness should not be permitted to testify to a legal conclusion at issue ***." *People v. Richardson*, 2013 IL App (2d) 120119, ¶ 10. Accordingly, error is found, and we must determine if such error was prejudicial. This is determined by considering whether the error was "so substantial that it undermines our confidence in the jury verdict." *Johnson*, 218 Ill. 2d at 141. Here, no such finding is possible

¶ 43    "The mere occurrence of improper remarks or testimony does not itself mandate reversal." *People v. Boshears*, 228 Ill. App. 3d 677, 688 (1992). " 'Error in the admission *** of evidence is harmless if the facts are strongly established by other competent evidence.' " *People v. Brouder*, 168 Ill. App. 3d 938, 945 (1988) (quoting *St. Gemme v. Tomlin*, 118 Ill. App. 3d 766, 770 (1983), and citing *People v. Duckworth*, 98 Ill. App. 3d 1034, 1037 (1981)). Here, the jury was able to view the surveillance video. As noted above, when addressing defendant's affirmative defense, the surveillance video clearly revealed defendant returning to the convenience store with a multi-tool in his hand. Further, defendant admitted returning to the store with the multi-tool in his hand when he could have simply left the area with no further confrontation. "However, even if the error is

15

plain, such an error is harmless where we can safely conclude that the trial would have produced the same result had the error not occurred." *People v. Jennings*, 364 Ill. App. 3d 473, 483 (2005) (citing *People v. Traina*, 230 Ill. App. 3d 149, 154 (1992)). Given the other evidence submitted, along with defendant's own admission, we find the error was harmless and no prejudice can be shown.

¶ 44     OSAD's final proposed issue is whether the trial court's imposition of a five-year sentence for defendant's conviction for aggravated battery was an abuse of discretion. "Although the legislature has prescribed the permissible ranges of sentences, great discretion still resides in the trial judge in each case to fashion an appropriate sentence within the statutory limits." *People v. Fern*, 189 Ill. 2d 48, 53 (1999) (citing *People v. Wilson*, 143 Ill. 2d 236, 250 (1991); *People v. James*, 118 Ill. 2d 214, 228 (1987)). The trial court is granted such deference because the trial court observes the defendant and the proceedings and thus is generally in a better position than the reviewing court to consider the sentencing factors. *Id.* The trial judge weighs such factors as "the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." (Internal quotation marks omitted.) *People v. Streit*, 142 Ill. 2d 13, 19 (1991). Consequently, reviewing courts must not substitute their judgment for that of the trial court merely because we would have weighed these factors differently. *Id.*

¶ 45     Defendant faced a sentencing range of two to five years' imprisonment. See 720 ILCS 5/12-3.05(h) (West 2022); 730 ILCS 5/5-4.5-40(a) (West 2022). In imposing the sentence, the trial court noted defendant's "not insignificant criminal history," which included a 37-month federal sentence and numerous state-court misdemeanor convictions, the need for deterrence, and the fact that defendant's conduct "threatened serious harm." The court observed as follows:

16

"Any number of bystanders that could have been in that store or entered that store could have been injured in the same way or worse. Ms. Roach also was injured, and could have been injured in a more substantial manner."

The court stated that it considered the mitigating factors mentioned by defense counsel, including that defendant did not contemplate that his conduct would cause serious harm, he acted under a strong provocation, there were "substantial grounds tending to excuse" his conduct, and that his conduct was the result of circumstances unlikely to recur. See 730 ILCS 5/5-5-3.1(a)(2), (3), (4), (8) (West 2022).

¶ 46 Although bodily harm is an element of aggravated battery, the trial court could properly consider the degree of harm. As noted by our supreme court:

"While the classification of a crime determines the sentencing range, the severity of the sentence depends upon the *degree of harm* caused to the victim and as such may be considered as an aggravating factor in determining the exact length of a particular sentence, *even in cases where serious bodily harm is arguably implicit in the offense for which a defendant is convicted.*" (Emphases in original.) *People v. Saldivar*, 113 Ill. 2d 256, 269 (1986).

Thus, the court properly considered the degree of harm defendant caused.

¶ 47                                    CONCLUSION

¶ 48 The court appropriately balanced the aggravating and mitigating factors. As such, the court did not abuse its discretion in sentencing defendant to five years' imprisonment. As this appeal presents no issue of arguable merit, we grant OSAD leave to withdraw and affirm the trial court's judgment.

¶ 49 Motion granted; judgment affirmed.